643 So.2d 1228 (1994)
Yevon M. PFIFFNER, et al.
v.
Amilcar J.E. CORREA, M.D., et al.
Nos. 94-C-0924, 94-C-0963, and 94-C-0992.
Supreme Court of Louisiana.
October 17, 1994.
Rehearing Denied December 8, 1994.
*1229 Edward J. Rice, Jr., L. Thomas Styron, Arthur F. Hickham, Jr., Adams & Reese, New Orleans, for applicant (94-C-0924).
Stewart E. Niles, Jr., Bruce J. Toppin, Patricia A. Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for respondent (94-C-0924).
Bruce J. Toppin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for applicant (94-C-0963).
Darryl J. Tschirn, Metairie, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Stewart E. Niles, Patricia Bethancourt, Adams & Reese, Edward J. Rice, Jr., L. Thomas Styron, Arthur F. Hickham, Jr., New Orleans, for respondent (94-C-0963).
Stewart E. Niles, Patricia Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for applicant (94-C-0992).
Darryl J. Tschirn, Metairie, Edward J. Rice, Jr., L. Thomas Styron, Arthur F. Hickham, Jr., Adams & Reese, Bruce J. Toppin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for respondent (94-C-992).
*1230 CALOGERO, Chief Justice.[*]
We granted plaintiff's writ application to determine whether a plaintiff can prevail in a medical malpractice action when she does not introduce an expert witness to testifyas to the applicable standard of care, its breach, and causation. As a general rule, a plaintiff can prevail under such circumstances when a defendant/physician or a defense expert testifies regarding the standard of care, and the objective evidence at trial is such that a lay jury can infer negligence from the facts. Accordingly, the court of appeal was in error when it stated that the absence of expert testimony by a plaintiff regarding a breach of the standard of care precludes success in a medical malpractice action.
A plaintiff must also establish, with adequate evidence, however, a causal connection between a defendant's negligence and the plaintiff's injuries. In applying this rule to the case before us, even if this Court were to assume that the defendants, Dr. Fontenelle and Dr. Correa, through their own testimony, had established the applicable standard of care, and there can be inferred by the lay jury from facts and/or the defendant/physicians' testimony a breach of that standard, plaintiff fails in this lawsuit because there is no evidence to support a finding that the purported breach of the standard of care was the cause of Pfiffner's death, or his loss of a chance of survival.[1] The jury was clearly wrong in finding that fault of Dr. Fontenelle and Dr. Correa contributed to Pfiffner's death.
This case involves a medical malpractice claim arising from the death of Mr. James A. Pfiffner. On April 12, 1983, Pfiffner, a longshoreman, received a blow to the head while assisting in off-loading cargo and dunnage from a ship at the Port of New Orleans. He did not lose consciousness immediately after the incident, but six days later, on April 18, 1993, he went to the emergency room at St. Claude General Hospital complaining of nausea, dizziness, severe headaches, and blurred vision. His diagnosis was "neck pains." The emergency room doctor telephoned Pfiffner's family physician, Dr. I.L. Fontenelle, to advise him of the patient's condition.
The next day, the Pfiffners went to see Dr. Fontenelle, a general medical practitioner, at his St. Claude Street office in New Orleans' 9th Ward near St. Claude General Hospital. Dr. Fontenelle examined Pfiffner and discovered that his condition had changed from the night before, as had then been reported to him by the emergency room attending physician. Dr. Fontenelle found nuchal rigidity (neck stiffness) and pupil dilation, symptoms which indicated a potentially serious neurological disorder. Dr. Fontenelle requested a neurological consultation and called Dr. Amilcar J.E. Correa, a neurologist board certified in neuroimagery and neurological surgery.[2]
The Pfiffners went to see Dr. Correa that same day, April 19. There is a dispute as to what time this visit occurred. At trial, Mrs. Pfiffner testified to the following sequence of events. On the morning of April 19, 1983, Dr. Fontenelle called the Pfiffners and asked them to come to his office immediately. Pfiffner was examined by Dr. Fontenelle at around 8:00 a.m. Based on this examination, Dr. Fontenelle recommended a neurological consult and spoke with Dr. Correa at his *1231 office at around 8:30 a.m. The Pfiffners then proceeded to Dr. Correa's office and arrived there at about 9:00 or 9:15 a.m. They waited approximately five hours, or until around 2:00 p.m., before Dr. Correa examined Pfiffner.
On the other hand, the testimony of Dr. Fontenelle, Dr. Correa, and Dr. Correa's receptionist, as well as documentary evidence and Mrs. Pfiffner's pre-trial deposition conflict with Mrs. Pfiffner's testimony at trial. During her deposition, when asked how long she and Mr. Pfiffner waited at Dr. Correa's office before being seen by him, Mrs. Pfiffner replied that it had been about thirty five to forty minutes. Moreover, Dr. Fontenelle testified that he did not examine Pfiffner until the afternoon of April 19. While the Pfiffners were in his office, he spoke to Dr. Correa about Pfiffner's change of symptoms and need for a neurological examination. The Pfiffners were then sent to Dr. Correa's office and arrived there around 4:00 p.m. A transfer note written by Dr. Fontenelle indicating the date and the time of his examining the patient (3:00 p.m.) supports this testimony. Moreover, Lilian Castillo, Dr. Correa's receptionist, and Dr. Correa both testified that Dr. Correa received a phone call from Dr. Fontenelle on April 19 at around 3:00 p.m. and the Pfiffners arrived at Dr. Correa's office around 4:00 p.m. Finally, the defendants' chronology of events is also supported by the fact that Dr. Correa's Prytania Street clinic across from Touro Infirmary did not open until 2:00 p.m.
As indicated at the outset of this opinion, plaintiff has the burden of proving the applicable standard of care, its breach, and causation. Because plaintiff clearly did not prove that the delay in treatment caused her husband's death or loss of a chance of survival, plaintiff cannot prevail. We, therefore, need not decide whether the jury was wrong in finding that plaintiff did prove the standard of care and breach thereof. By this means of resolving this case, we therefore concede that the jury was correct in finding Dr. Correa had delayed treating Pfiffner for five hours, and that by such delay, Dr. Correa breached the standard of care he owed to Pfiffner. We also concede for present purposes that plaintiff established the standard of care by testimony from Dr. Correa that seriously ill patients must be quickly diagnosed and treated. Although the only expert to testify was Dr. Correa and he testified that he did not breach this standard, we do not conclude that the jury was wrong in this decision. Nonetheless, we find that Dr. Correa must prevail in this action because there is no support for the jury's finding that this breach contributed, in whole or in part, to Pfiffner's death. Assuming the jury reasonably concluded that Dr. Correa was at fault, it cannot conclude, since there is no evidence of the same, that such fault caused Pfiffner's death, or loss of a chance of survival.
In making the same concession regarding the defendant Dr. Fontenelle, we note that Dr. Fontenelle must likewise prevail because here, too, no evidence demonstrates any causal nexus between Dr. Fontenelle's alleged negligence and Pfiffner's demise.[3]
Upon examining Pfiffner, Dr. Correa discovered that he was suffering from marked stiffness of the neck. Dr. Correa also observed pupil constriction but did not find papilledema (swelling of the head or optic nerve). The optic nerve did not indicate any increased intracranial pressure. Dr. Correa's differential diagnosis was that Pfiffner was suffering from meningitis or subarachnoid hemorrhage. After a lumbar puncture and CT scans, Pfiffner was sent to Chalmette General Hospital. The CT scans revealed cerebritis (an inflammation of the brain) and *1232 a "space occupying lesion consistent with intracerebral abscess in the posterior parietal area on the right hemisphere." Dr. Correa's diagnosis, based on the clinical findings, the CT scan, and the spinal fluid test, was non-infectious intracerebral abscess causing a meningeal syndrome and possible aseptic ventriculitis. Surgery offered no hope for patient improvement because the lesion had not encapsulated and, additionally in Dr. Correa's opinion, Pfiffner's medical condition was too poor to tolerate surgery.[4] Upon admittance to the hospital, Pfiffner had a general seizure and remained in a semi-comatose state for the remainder of his hospitalization. Four days later, on April 23, 1983, Pfiffner died. The cause of death was respiratory arrest due to increased intracranial pressure as a result of the inoperable cerebral mass lesion.
On April 13, 1984, Mrs. Pfiffner filed a complaint against Dr. Fontenelle and Dr. Correa with the Commissioner of Insurance. Three days later, on April 16, 1984, she brought suit "individually and on behalf of her deceased husband and his estate" against Dr. Fontenelle, Dr. Correa, Diagnostic Services, and St. Claude General Hospital. Dr. Fontenelle filed an exception of prematurity which was maintained. The suit against Dr. Fontenelle was thereupon dismissed without prejudice. Diagnostic Services was dismissed because plaintiff failed to amend her petition after its exception of no cause of action was maintained.
Thereafter, the complaint filed with the Commissioner of Insurance against Drs. Fontenelle and Correa was brought before a Medical Review Panel pursuant to LSA-R.S. 40:1299.41 et seq. On September 6, 1986, the Medical Review Panel found that the evidence did not support a conclusion that Dr. Fontenelle had breached the applicable standard of care. On June 16, 1987, the Panel reached the same conclusion as to Dr. Correa.
On September 14, 1987, Mrs. Pfiffner filed a second lawsuit, this one not premature, against both doctors, St. Claude General, and Diagnostic Services. The major thrust of her claim was that Drs. Fontenelle and Correa had unreasonably delayed the diagnosis and treatment of her husband and thus, caused his death, or at least, his loss of a chance of survival.
After plaintiff voluntarily dismissed her claim against Diagnostic Services and St. Claude General Hospital, the trial as to Drs. Fontenelle and Correa was conducted. At the close of Mrs. Pfiffner's case, both Drs. Fontenelle and Correa moved for a directed verdict, which the court denied. The jury rendered a verdict in excess of $100,000 in favor of Mrs. Pfiffner, "individually and on behalf of her deceased husband," against Drs. Fontenelle and Correa. The jury apportioned negligence at 60% for Dr. Correa and 40% for Dr. Fontenelle. Both doctors filed a Motion Notwithstanding Jury Verdict. On March 22, 1991, the judge executed an amended judgment limiting the liability of Drs. Fontenelle and Correa to the statutory limit of $100,000 pursuant to LSA-R.S. 40:1299.47, but casting the Patients' Compensation Fund for the excess of $200,000.
Both physicians appealed to the Court of Appeal, Fourth Circuit. After a three-judge panel indicated a 2-1 split favoring reversing the district court, a five judge panel[5] in a 3-2 decision affirmed the judgment below. 640 So.2d 281. It then reinstated and amended the January 25, 1991 judgment to hold Drs. Fontenelle and Correa responsible for $100,000 each of Pfiffner's $320,000 award, and the Patients' Compensation Fund, the balance. Writs were granted by this Court upon applications by Drs. Correa and Fontenelle and the Louisiana Patient's Compensation Fund.
Medical malpractice has been defined by LSA-R.S. 40:1299.41(A)(8) as:
any unintentional tort or any breach of contract based on health care or professional *1233 services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
Revised Statute 9:2794 sets forth the burden of proof imposed upon the plaintiff in establishing his malpractice claim. The plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
See La.Rev.Stat.Ann. § 9:2794(A) (West 1991). Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom.
Although LSA-R.S. 9:2794(B) grants any party to the suit the right to subpoena any physician without his consent for a deposition or testimony at trial to establish this standard of care, see La.Rev.Stat.Ann. § 9:2794(B) (West 1991), the statute is silent as to whether such experts are necessary in order for the plaintiff to meet his burden of proof. A majority of Louisiana court of appeal cases have held that such expert testimony is necessary.[6] In other court of appeal decisions, however, the courts have stated that the standard of care for any particular community or locale, or specialty, is merely "best determined from the testimony of other experts in the field," not absolutely required. See Broadway v. St. Paul Ins. Co., 582 So.2d 1368, 1373 (La.Ct.App. 2d Cir.1991) (emphasis added). Although such testimony is persuasive, it is not always controlling. See, e.g., Cherry v. Herques, 623 So.2d 131 (La.Ct. App. 1st Cir.1993); Linares v. Louisiana DOTD, 582 So.2d 879, 878 (La.Ct.App. 4th Cir.1991); Harmon v. Levenson, 534 So.2d 486, 488 (La.Ct.App. 5th Cir.1988); Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571, 574 (La.Ct.App. 4th Cir.), writ denied, 507 So.2d 1247, 1248 (La.1987); Wiley v. Karam, 421 So.2d 294, 297 (La.Ct.App. 1st Cir.1982).
The jurisprudence has also recognized that there are situations in which expert testimony is not necessary. Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence. See Hastings v. Baton *1234 Rouge Gen. Hosp., 498 So.2d 713, 719 (La. 1986). Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician's fault. See id. at 719-20. Likewise, where the defendant/physician testifies as to the standard of care and his breach thereof, see, e.g., Riser v. American Medical Int'l Inc., 620 So.2d 372, 377 (La.Ct.App. 5th Cir.1993), or the alleged negligence consists of violating a statute and/or the hospital's bylaws, see, e.g., Hastings, 498 So.2d at 722 (violation of LSA-R.S. 40:2113.4 which imposes duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and hospital bylaws establishing duties for on-call physicians), expert testimony is also unnecessary to establish a malpractice claim.
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged.
In this case, the alleged negligence is not like a physician's leaving a sponge in a patient's body or his amputation of the wrong leg; the plaintiff here claims that her husband's death was caused by an unnecessary delay in diagnosis and treatment. There are surely cases in which there are obvious unnecessary delays in treatment which constitute medical malpractice and where causation is evident. One obvious situation would be where a seriously injured patient is left to bleed to death in an emergency room. And there no doubt are other instances in which the medical and factual issues are within the lay person's ability to perceive as negligence and harmful through delay in treatment.
The causal connection between a patient's death and an unreasonable delay vis a vis a neurosurgeon's diagnosis and treatment of a patient in circumstances involving a complex medical condition, however, is simply beyond the province of lay persons to assess. Plaintiff here needed to establish, either through her own experts or the testimony of the defendants or defense experts, that given her husband's medical history and condition, as well as the defendants' clinical and diagnostic findings, Drs. Fontenelle and Correa breached a specified standard of care (perhaps that under these circumstances, more expeditious treatment was necessary) and that this breach caused Pfiffner's death or loss of a chance of survival. In the absence of such testimony, and even assuming all other facts favorable to the plaintiff, the decision of the lower courts must be reversed because there is no proof that Pfiffner would have fared any better had Drs. Fontenelle and Correa seen him any earlier than they did. In fact, the evidence is to the contrary. Mrs. Pfiffner did not meet her burden of establishing that the alleged unreasonable delay in the diagnosis and treatment of Pfiffner contributed, in whole or part, to her husband's death or loss of a chance of survival.
There are two relevant questions pertaining to causation in this case. The first is: If Dr. Fontenelle had personally examined Pfiffner the night he came to St. Claude Hospital on April 18, 1983, and Dr. Correa, earlier than he did on April 19, would they have been able to discover the severity of Pfiffner's condition at that time so as to initiate successful treatment prior to Pfiffner's seizure and resultant decline into a semi-comatose state? Mrs. Pfiffner contends that Dr. Fontenelle was negligent in not coming to St. Claude Hospital and examining her husband when by telephone she had *1235 asked him to come. She insists that had Dr. Fontenelle seen her husband that evening, he would have realized the serious nature of her husband's condition and ordered a neurological consult that night. If Dr. Fontenelle had called a neurosurgeon that night, following Mrs. Pfiffner's argument, the neurosurgeon could have operated on her husband prior to his seizure which resulted in the swelling of his brain. Mrs. Pfiffner contends that the delay in diagnosis and treatment resulted in a lost "window of opportunity" in which Dr. Correa could have operated. Accordingly, she claims that the defendants missed an opportunity to save her husband's life.
It must, therefore, first be determined whether Dr. Fontenelle should have been alerted to the severity of Pfiffner's condition the night of April 18, 1983 so that earlier treatment could have been effected. We must also determine whether Dr. Correa should have examined, diagnosed, and initiated treatment earlier than he did. If so, the second question is whether the defendants' failure to undertake an earlier course of treatment decreased Pfiffner's chances of survival.
The only expert testimony regarding causation was given by Dr. Correa and it favored the defendants. After reviewing the testimony of Dr. Correa, it is clear that Pfiffner suffered from an inoperable brain lesion that had ruptured, spilling toxins into the spaces within his brain, causing chemical meningitis, which caused seizures, then swelling, and ultimately, his death. Even had the defendants seen Pfiffner the night of April 18, 1983 and even had they diagnosed Pfiffner's brain lesion that evening, there is no support for Mrs. Pfiffner's contention that earlier surgical intervention would have saved her husband's life. Surely plaintiff presented no such evidence by any expert, including testimony presented by the defense.
At trial, Dr. Correa testified as follows. Pfiffner suffered from chemical meningitis, an irritation of the covering of the brain by a toxic substance that is liberated into that space by the rupture of a cerebritis (early stage of an abscess), or an abscess. Pfiffner suffered from a space-occupying lesion with no mass effect. What this means is that Pfiffner had a brain abnormality that takes up space, but which was not pushing one side of the brain over onto the other (mass effect) and causing intracranial swelling. Surgical removal of the lesion affecting Pfiffner's brain was not indicated because the lesion had not encapsulated. Rather it was a "sort of a mashy [mushy?] ... area of the brain contaminated with this chemical irritant that has extruded into ... the ventricle [on] one side and into the surface of the brain." The results of the CT scans indicated that Pfiffner was suffering from cerebritis (an early stage of abscess), chemical ventriculitis (inflammation of the ventricles), and cortical irritation (the cortex is the outside covering of the brain). The CT scans revealed no evidence of mass effect. Cerebritis is an early stage of brain abscess which has not yet encapsulated. Because it is not yet encapsulated, surgery offers no remedy (Dr. Correa's words were "surgery was not indicated"). An abscess, on the other hand, is encapsulated, produces mass effect, and can be surgically removed. In Pfiffner's case, an abscess never formed because the lesion, according to Dr. Correa, had ruptured into the subarachnoid space of Pfiffner's brain as well as into the ventricles. This rupture created the chemical meningitis. If Pfiffner had a lesion with mass effect, then surgery would be indicated. According to Dr. Correa, a lesion with mass effect compresses the brain against the skull and causes swelling. This swelling can lead to a decerebrate condition, coma, and death.
In answering a question at trial regarding the appropriate treatment for chemical meningitis patients, Dr. Correa noted that some patients "do respond by supportive care, but there is no treatment for chemical ventriculitis or chemical meningitis." He testified that such supportive care consists of providing the patient with the proper fluids and general medical care and avoiding any complications while giving the brain the opportunity to recover from the toxic effect. The record clearly demonstrates that Pfiffner was provided with such supportive care. In spite of that care, Pfiffner suffered convulsions caused by the release of toxins resulting *1236 from the lesion's rupture. Dr. Correa explained that these convulsions caused swelling, which swelling, when it became too great, caused Pfiffner to decerebrate and eventually, to die. The medical records demonstrate that Dr. Correa provided Pfiffner with anti-seizure medication. Dr. Correa also testified that there are three ways to control swelling: 1) the administration of steroids; 2) the administration of Mannitol to dehydrate the brain (thus by removing fluids, leaving more room for the brain); and 3) hyperventilating the patient and thus, reducing the blood flow to the brain (and again making more room for the brain). Despite receiving all three treatments, Pfiffner's brain continued to swell. Pfiffner subsequently became decerebrate (which means that he no longer moved spontaneously and had an abnormal reaction to painful stimuli because certain areas of the brain cease functioning). This decerebration led to Pfiffner's coma on April 22, 1983, and his death the following day.
Accordingly, even if Dr. Fontenelle and Dr. Correa or another neurosurgeon had attended Pfiffner at St. Claude Hospital the evening of April 18, 1983, and despite the absence of any symptoms at that time of a serious neurological disorder, had performed a lumbar puncture and CT scan, and had properly diagnosed Pfiffner as suffering from chemical meningitis due to the rupture of an unencapsulated brain lesion, there is no evidence to support a finding that this course of action would have changed the progress of Pfiffner's illness. They would not have operated then, or later. Even if we were to concede that Drs. Correa and Fontenelle should have attended Pfiffner that evening, or Dr. Correa should have seen him five hours earlier on the next day, we find no evidence in the record to support a conclusion that had this earlier intervention taken place, Pfiffner's outcome would have been any different. The only expert's testimony clearly demonstrates that Pfiffner's condition was, at all times up to his death, inoperable. Because earlier medical intervention would not have preserved some chance of survival Pfiffner may have had, we find that the plaintiff has not established the requisite element of causation in this medical malpractice action.

DECREE
Accordingly, the judgments of the Orleans Parish Civil District Court, and the court of appeal are reversed. The plaintiff's lawsuit is dismissed with prejudice at their cost.
REVERSED AND RENDERED.
NOTES
[*] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participated as Associate Justice Pro Tempore (effective September 1, 1994). Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis in cases argued on September 6-8 and 12, 1994, was the judge not on panel for this case. See Rule IV, Part 2, § 3.
[1] In cases where a patient has died, the plaintiff need not demonstrate "that the patient would have survived if properly treated." See Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1278 (La.1991). Rather, he need only prove that the patient had a chance of survival and that his chance of survival was lost as a result of the defendant/physician's negligence. See Smith v. State through Dep't of Health and Human Resources Admin., 523 So.2d 815, 820 (La.1988). The defendant/physician's conduct "must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause." See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 720 (La.1986).
[2] After advising the Pfiffners that a neurological consult was necessary, Dr. Fontenelle asked them whether they knew a neurosurgeon who could see Pfiffner immediately. Mrs. Pfiffner recommended Dr. Correa.
[3] It is difficult to defer to the jury in the case of Dr. Fontenelle for it is hard to find any support in the record to demonstrate that Dr. Fontenelle breached his duty toward Mr. Pfiffner. Although the jury was impressed with the fact that Dr. Fontenelle did not come when called from the emergency room at St. Claude Hospital on April 18, Mr. Pfiffner exhibited no alarming symptoms upon examination by the emergency room physician. Dr. Jones. This was reported to Dr. Fontenelle by telephone. The nuchal rigidity which prompted Dr. Fontenelle's recommendation that a neurologist be called in was not evident until the following day, April 19. Dr. Fontenelle's not going to the hospital the night of April 18, therefore, was likely not unreasonable or inappropriate under the circumstances. As earlier indicated in the opinion, however, we decide the case for defendants because of the absence of proof of causation.
[4] Mr. Pfiffner suffered from obesity, high blood pressure, diabetes, and heart problems. An EKG taken shortly after his arrival at the hospital evidenced myocardial ischemia (poor blood flow to the heart).
[5] See La. Const. of 1974, art. V, § 8(B) (West 1977).
[6] See, e.g., Roland v. Tedesco, 616 So.2d 780, 783 (La.Ct.App. 2d Cir.), writ denied, 619 So.2d 579 (La.1993); Jure v. Raviotta, 612 So.2d 225, 230 (La.Ct.App. 4th Cir.1992), writ denied, 614 So.2d 1257 (La.1993); Mike v. Maxwell, 577 So.2d 1090, 1094 (La.Ct.App. 1st Cir.1991); Young v. Colligan, 560 So.2d 843, 845 (La.Ct.App. 3d Cir.), writ denied, 565 So.2d 452 (La.1990); LeBlanc v. Krupkin, 555 So.2d 600, 603 (La.Ct.App. 1st Cir.1989), writ denied, 558 So.2d 603 (La. 1990); Frasier v. Dept. of Health & Human Resources, 500 So.2d 858, 861 (La.Ct.App. 1st Cir. 1986); Steinbach v. Barfield, 428 So.2d 915, 919 (La.Ct.App. 1st Cir.), writ denied, 435 So.2d 431 (La.1983).