11YELVERTON, Judge.
Dalton Jeans, 49, took a dose of a homemade remedy containing phenylpropanola-mine on the morning of November 14, 1990. That night he suffered a hypertensive (high blood pressure) crisis, his blood pressure at one point going to 270/150. He lived, but suffered brain damage. Based on his treating physician’s opinion that the hypertensive crisis was caused by the medication, Jeans, joined by his wife and his son, sued the pharmacist, J. Garrett Caraway, who had prescribed and given him the medication. At the trial, a number of experts gave their opinions. A jury, responding to the first interrogatory on the verdict sheet, “Was there any fault on the part of the defendant, J. Garrett Caraway, which was a legal cause of injuries, if any, to the plaintiff, Dalton Jeans?” answered //NO, and that ended the eight day trial with a judgment dismissing the plaintiffs’ case. They appealed. We' affirm.
^Causation is the only issue on appeal. The issue is contained in the verdict sheet interrogatory just quoted. Although the jury interrogatory actually contains three elements, or questions, dealing with fault, causation, and injuries, fault and injuries were clearly established. The jury would have been manifestly wrong to have found the absence of either of those two elements. Causation is the only issue concerning which there are two permissible views of the evi- *1143 denee. In its charges the court gave a definition of cause-in-fact. Guided by a cause-in-fact instruction, the jury reached its decision. The issue on appeal is whether the jury was clearly wrong in finding that the ministration of phenylpropanolamine by the pharmacist, Caraway, was a eause-in-fact of Jeans’ hypertensive crisis.
In tort eases and other civil actions, plaintiff, in general, has the burden of proving every essential element of his case. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993). In a malpractice claim the plaintiff must demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged. Pfiffner v. Correa, 643 So.2d 1228 (La.1994). A Court of Appeal may not set aside a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. When there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Jeans had sinus problems. He had been treated by Dr. Richard Henry Kent, an allergy specialist, for years. One day in September 1990 some friends told Jeans about some medicine available at Caraway’s Pharmacy. Caraway, a pharmacist for over 30 years, had established a practice of concocting his own medications with mixtures of what he believed to be over-the-counter drugs. There were several of these which he mixed up and gave names like Snoddgrass, Super Snodd-grass, Super de Snuff, Nu-Triphenyl TD, Redeye, Little Red, Goose Grease, and Bee Bottom Balm. Caraway remembered when Jeans first came to see him in the fall of 1990. They talked a pretty good time, discussing what Jeans wanted and what he thought he needed. Jeans told him he had headaches and sinus problems. He questioned Mr. Jeans “about his health and things like that, which was normal procedure.” “Then,” he said, “I gave him some medication, one of my formulas that I routinely put together; and I told him how to take it and what to expect.” They never talked [-¡about blood pressure. Dalton later called the pharmacy to complain that the Snoddgrass was not working. He was given Super Snoddgrass. This, too, failed to work so he was given Super De Snuff. He was finally given Nu-Triphenyl TD.
On the morning of November 14 at 8:00 o’clock, Dalton took his daily dose of the Nu-Triphenyl TD. This remedy, like the Snodd-grass concoctions and the Super de Snuff, contained phenylpropanolamine. Late that afternoon is when he suffered the hypertensive crisis.
Phenylpropanolamine is a decongestant. It can cause an elevation of blood pressure. It is an ingredient in numerous sinus and cold medicines sold over the counter. At the time the plaintiff was taking the medication given him by Caraway in September, October and November of 1990, it was a prescription drug. Jeans did not have a prescription for it.
The Caraway remedy he named Nu-Tri-phenyl TD contained a “Three Amines” sustained release tablet and one ibuprofen capsule. The “Three Amines” tablet consisted of 50 mg phenylpropanolamine, 25 mg pheni-ramine, and 25 mg pyrilamine.
In 1990 when Jeans bought these products from Caraway, the law required that the ingredients of the product be listed on the bottle and that all the manufacturer’s labeling be included with the product. It is not denied that Caraway dispensed a prescription drug without a prescription, although not intentionally. He also did not deny that the bottles were improperly labelled; he admitted he was not aware of the changes in the law.
The dispute in this case, however, is not about fault. The dispute is about cause. If the phenylpropanolamine found in the Nu-Triphenyl TD was not proved to have caused the hypertensive crisis suffered by Jeans, then Caraway’s actions were not a eause-in-fact of his injuries.
Expert testimony by both sides was introduced on the issue of phenylpropanola-mine’s relation to the hypertensive crisis. It is distinctly within the province of the trial fact finder to assess the credibility of expert witnesses and the weight to be assigned to their testimony. The evaluations of and conclusions drawn from competing expert testi *1144 mony will not be disturbed on appeal in the absence of manifest error. Faustina Pipe Line Co., v. Hebert, 469 So.2d 483 (La.App. 3d Cir.), writ denied 474 So.2d 1295 (La.1985).
14Pr. Kent, the allergy specialist, testified. During his treatment of Jeans over the years he took his blood pressure routinely. On discovering on November 8, 1990, a blood pressure of 170/108, he told Jeans he ought to see another doctor about his blood pressure. He testified at the trial that he was unaware that Jeans was taking medication on the side, and he would not have prescribed phenylpropanolamine to a patient with blood pressure of 170/108.
Dr. R.D. Paraguya was the internist who treated Jeans when he arrived at Lake Charles Memorial Hospital on November 14. He had treated Jeans previously for hepatitis and other ailments. He diagnosed Jeans with hypertension secondary to medication because he had been told he was taking a decongestant. Dr. Paraguya stated that 50 mg of phenylpropanolamine was an over-the-counter strength dosage, and that he would not expect a hypertensive crisis from that dosage. He was told at the hospital that the medication Jeans had been taking was strong. His discharge diagnosis was that the hypertensive crisis was probably caused by medication. The jury could have reasonably interpreted Dr. Paraguya’s opinion as based on the belief that Jeans was taking phenyl-propanolamine in stronger than therapeutic doses.
Dr. Neal Benowitz of San Francisco, an expert in clinical pharmacology, medical toxicology, and internal medicine with an emphasis on hypertension, testified for the plaintiffs. He explained that phenylpropanola-mine constricts the blood vessels in the nose, and this is why it is used in medication for colds and hay fever. It can also constrict other blood vessels in the body. Dr. Benow-itz was of the opinion that this constriction causes high blood pressure. He opined that taking the Nu-Triphenyl TD which contained phenylpropanolamine caused the hypertensive crisis in Jeans. Dr. Benowitz’ explanation that this was an adverse drug reaction was based on three considerations. One was the nature of the reaction: he believed, though he had no scientific proof, that some very sensitive individuals could have elevated blood pressure even with standard doses of phenylpropanolamine. The second consideration was the time course of the reaction: the causal relationship in this case was supported by his study of Jeans’ medical records and his findings that Jeans had normal or only mildly elevated blood pressure until about a week before the crisis, and then within a year after the crisis his blood pressure was almost normal again without his having to | stake medication for lowering blood pressure. The third consideration supporting his opinion was that he could find nothing else in the medical records to explain the crisis.
Dr. Raymond Harbison, a pharmacologist and toxicologist, testified for the defendant. He was not himself a medical doctor but he was a professor in a medical school. He explained the effect that phenylpropanola-mine would have in causing a hypertensive crisis. If too much phenylpropanolamine is ingested, it can cause significant constriction of the blood vessels throughout the body, and that constriction can result in an elevation of blood pressure. However, he was of the opinion that a therapeutic dose of a sustained release formulation of phenylpropanolamine would elevate the blood pressure only slightly, to an extent clinically insignificant. He stated that there must be an overdose of phenylpropanolamine to cause a significant increase in blood pressure like that seen in Jeans. Dr. Harbison was of the opinion that 50 mg of phenylpropanolamine found in the “Three Amines” tablet taken by Jeans in the morning would not cause a hypertensive crisis in the evening. It would all be out of his system by that time. He was aware that Jeans had been seeing Dr. Richard Kent for his allergy problems and on a visit on November 8, six days before the hypertensive crisis, his blood pressure was 170/108. Although Dr. Harbison admitted that it was not wise to continue taking phenylpropanolamine when Jean’s blood pressure was 170/108 on November 8, he saw no evidence to suggest that 50 mg of phenylpropanolamine was high *1145 enough to have kicked this elevated blood pressure into a hypertensive crisis.
Dr. Harbison also believed it was significant that Jeans had been exposed to phenyl-propanolamine for a period of time before the hypertensive crisis on November 14, 1990, and he did not experience a hypertensive crisis during that period of exposure. Observing that Jeans had elevated blood pressures after the hypertensive crisis when he was not taking phenylpropanolamine, he gave this as another reason why this could not have been the cause of his high blood pressure.
Dr. Mark Strauss, a general internist, testified for the defendant. Fifty percent of his patients suffered from high blood pressure. He could not recall seeing a ease where a therapeutic dose of phenylpropanolamine caused a hypertensive crisis. His opinion was that therapeutic doses 16of phenylpropa-nolamine would not cause a hypertensive crisis, nor would repeated doses. Taking more than the recommended dose could do it. Although phenylpropanolamine combined with antihistamines might increase the blood pressure, he was of the opinion that it did not cause Jeans’ hypertensive crisis. He explained that there were other possible diagnoses of Jeans’ elevated blood pressure, such as renal artery stenosis or seizure activity mimicking a hypertensive crisis.
The expert testimony, summed up, shows that phenylpropanolamine can cause an elevation in blood pressure. The facts reveal that Jeans took phenylpropanolamine over a period of time, ministered to him by the defendant Caraway. The evidence fails, however, to prove that the phenylpropanola-mine was the most probable cause of his blood pressure crisis on November 14, 1990. There is no evidence that he took doses in excess of therapeutic quantities, and many experts testified it would take overdoses of phenylpropanolamine to cause a hypertensive crisis. Dr. Benowitz, the expert who believed therapeutic doses over a prolonged period could cause such a crisis, could offer no scientific proof for that hypothesis. Considering this testimony, we cannot say that the jury was clearly wrong in its determination that Caraway’s actions were not a cause of Jeans’ hypertensive crisis and resulting injuries. Although there was evidence that phenylpropanolamine can cause elevated blood pressure, there was testimony by several witnesses that 50 mg of phenylpropano-lamine found in the “Three Amines” tablet taken by Jeans would not cause the significant increase in blood pressure he experienced on November 14.
We have thoroughly studied this entire record. There are two sides, both supported by substantial evidence. We cannot say the jury was clearly wrong. For these same reasons we find that the trial judge was also correct in denying the motion for judgment notwithstanding the verdict and/or a new trial.
The judgment of the trial court is affirmed at plaintiffs’/appellants’ cost.
AFFIRMED.