11ARMSTRONG, Judge,
dissenting with reasons.
I respectfully dissent because I believe that the plaintiffs did not meet their burden of introducing expert medical testimony that the defendant doctor failed to meet the standard of care. As an initial point, we must decide whether expert medical testimony is necessary in this case. The standard for deciding that issue is clarified by the Supreme Court in Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La. 10-17-94), 643 So.2d 1228.
The jurisprudence has also recognized that there are situations in which expert testimony is not necessary. Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient’s body, from which a lay person can infer negligence. See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 719 (La.1986). Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician’s fault. See id. at 719-20. Likewise, where the defendant/physician testifies as to the standard of care and his breach thereof, see, e.g., Riser v. American Medical Int’l Inc. 620 So.2d 372, 377 (La.Ct.App. 5th Cir. 1993), or the alleged negligence consists of violating a statute and/or the hospital’s bylaws, see, e.g., Hastings, 498 So.2d at 722 (violation of LSA-R.S. 40:2113.4 which imposes duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and hospital bylaws establishing duties for on-call physicians), expert testimony is also unnecessary to establish a malpractice claim.
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794’s requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendani/physician, which demonstrates a breach thereof.
laPfiffner, supra at 9-10, 643 So.2d at 1233-34.
It is clear from the facts discussed below that the present case does not present any of the situations identified by Pfiffner as not requiring expert testimony as to the issue of whether the defendant doctor failed to meet the standard of care. Instead, the present case involves the exercise of medical judgment when there are competing medical considerations as to the proper action to be taken by the doctor. Pfiffner holds that most medical malpractice cases do require expert testimony as to whether the doctor met the standard of care; and this is one of those cases.
The plaintiffs’ primary theory at trial was that the cast applied by the defendant doctor was too loose. This, plaintiffs argue, allowed the malalignment which required surgery on Amanda Torbert’s forearm. The plaintiffs also argue that the defendant doctor did not see Amanda Torbert for follow-up visits frequently enough after he applied the cast.
The following medical background is undisputed. The purpose of applying the cast (aside from protecting the broken arm from outside impacts) was to immobilize the broken bones in the forearm in a position of acceptable alignment while the arm healed. The cast went from the knuckles up to near the top of the upper armpit and was an L- *1219 shaped cylinder. (The record contains a photograph of Amanda Torbert in the cast.)
The cast should be snug enough to immobilize the broken bones in acceptable alignment. If the cast is too loose, then this can allow the bones to get out of acceptable alignment and heal in a malaligned position requiring surgery to correct. On the other hand, the cast must not be too tight. If the east is too tight, this can cause circulation problems leading to the destruction of tissue, gangrene, and even the loss of the limb. Thus, a balance must be struck in fitting the cast and the consequences of the cast being too loose, while significant, are not as grave as those resulting from the cast being too tight.
With the type of break suffered by Amanda Torbert, it is the portion of the cast covering the middle forearm that must not be too loose. Looseness in the portion of the cast covering the upper arm or the hand is not a concern as to malalignment. (Thus, the lay testimony of looseness in those areas of the cast is irrelevant.)
During the several days after an arm break, swelling can occur, and this will make the cast tighter. To guard against this, a score can be made in the east which will allow it to | .-¡expand some and this was done in the present ease. Also, after swelling goes down, the east will fit more loosely. To deal with this, a scored cast can be taped with adhesive tape and, while the evidence is somewhat mixed as to whether that was done in this case, there is no evidence of whether or not taping was necessary in this case.
If the cast becomes too loose, it can be removed and a new east applied. However, when a cast is changed, it is possible that malalignment will occur during the change. Thus, in order to avoid that risk, the cast should not be changed unless necessary.
The type of broken forearm suffered by Amanda Torbert with both the radius and the ulna broken, is highly unstable. Consequently, malalignment is not an uncommon complication with this type of broken forearm. About 15% of such broken forearms malalign. This can result from the natural pulling of the muscles on the broken bones even if the cast is applied properly. Thus, the mere fact that malalignment occurs is not, by itself, indicative of the cast being too loose or of the treatment otherwise being improper.
The only way to insure against malalignment in the case of a broken arm of the type suffered by Amanda Torbert would be to go ahead and do the surgery such as was eventually done on the plaintiff by Dr. Haddad. But, in 85% of cases, the use of a east is successful, and so surgery is not necessary. Consequently, the standard practice is to first attempt the use of a cast as was done in the present case. But, because of the possibility of malalignment, the patient must be closely followed by the doctor.
In light of the above-discussed undisputed medical background, I believe it can be seen that the issue was not simply whether the plaintiffs cast was “loose” but, instead, whether the plaintiff’s cast was too loose. The plaintiffs presented the testimony of themselves and two family friends as to the looseness of the cast. The testimony was not based on any measurements, but was descriptive. Of course, all of that was lay testimony. While it could supply information as to how loose the cast was, it could not answer the determinative question of whether the cast was too loose. For that, the plaintiffs turned to the expert testimony of Dr. Reyes.
However, although it appears that the plaintiffs’ counsel twice asked the right question, Dr. Reyes did not answer it squarely either time. When his testimony is taken as a whole, Dr. Reyes did not answer the question of whether Amanda Torbert’s cast was in fact too loose, so that it needed to be changed. Instead, Dr. Reyes responded that, if a cast is too Lloose, then it should be changed. In fact, like the other physician witnesses, he testified that the cast should not be too tight for fear of cutting off circulation. Because, to be fairly understood, Dr. Reyes’s testimony must be taken as a whole, it is necessary to quote some of it at length.
Q. We have had testimony prior to your coming here Ms. Amanda Torbert explained to the jury how loose her east was and she described it in this manner. *1220 You did not see Amanda back in July of 1985; is that correct?
A. I did not see her until after she had her surgery.
Q. I want to give you these facts which are in evidence and then ask your opinion. If in fact nine days after Amanda broke her arm, the cast was so loose that Amanda could insert several of her fingers down into the top of the cast as I’m demonstrating to you here and could move the cast with her arm — with her hand and could also insert several fingers inside the top of the cast and also underneath on the palm side of the cast, and if in fact also there was such movement that her elbow became sore or irritated from the cast being loose and in fact even a rub spot about halfway between the elbow and the wrist, if in fact those things did exist, is that cast too loose for this type of fracture and should it be replaced?
A. If a patient presented he or she to me with a loose cast, I would have at that point with this type of fracture I would have taken an X-ray to see if there had been any movement in the bones and I probably would have removed the east and applied a new cast and made it a little bit snug. The problem that we have in treating these fractures is that it you make the cast too tight, then you get circulatory problems, and, of course, if you make it tight, you may be able to preserve the bone in proper alignment but then the patient starts getting circulatory problems and if you don’t attend to that you can get gangrene. If you make the cast too loose, then the cast can go ahead and the bones can angu-late. A cast that is properly applied at the time of the fracture may become loose once the swelling has receded, so that if a patient has a cast that you feel is proper, three or four days later the cast may become loose because the swelling has gone down and this fracture can angulate. (emphasis added)
Q. In fact, that’s why you need to follow this type of fracture so closely?
A. That’s correct.
Q. If displacement or it starts to angulate during the healing process because a east is too loose, the best thing to do is immediately change the cast and get it snug around the arm, is that a fair statement?
IsA. In a young person if you catch this early you can go ahead and remanipu-late the fragments and put them in good position and recast the patient but still with the same problems that you had the first time that the cast can become loose or the cast can become too tight.
Q. What you just said, is that the standard of care that is expected of a physician in the field of orthopedics in terms of the care for their patient?
A. Yes.
Q. So therefore leaving on a loose cast as described to you instead of replacing it with a snug one and following it closely is a breach of the standard of care that’s expected of a physician in this field of specialty, is that a fair statement?
[[Image here]]
THE WITNESS:
If a patient presented he or she to me with what I thought was a loose cast with this type of fracture, I would take an X-ray at that time and then I would make a determination as to whether I felt that I needed to place a cast, put a snug east on and again sometimes the physician is caught in a bind because if you put the cast on too tight, you get circulatory problems with angulation and I would rather have problems with angulation than with circulatory problems, (emphasis added)
What is absent from Dr. Reyes’s testimony is any statement that Amanda Torbert’s cast, as described in the hypothetical question, was so loose as to need replacement. At times, Dr. Reyes speaks of a “loose” cast but, at other times he uses the phrase “too loose” to describe a east that needs to be changed. In context, the only reasonable view of Dr. Reyes’s testimony is that, when he speaks of a “loose” cast, he means a cast that is “too loose.”
In particular, Dr. Reyes twice emphasized that he would take an X-ray to examine the *1221 broken bones’ alignment, as opposed to merely looking at the cast itself prior to making a determination as to whether to change the east. That in itself negates the hypothetical question, which he was asked by the plaintiffs’ counsel as that hypothetical was based on testimony describing the fit of the cast and not, of course, on any X-ray results. Indeed, it is undisputed that X-rays were taken right after the cast was applied, and again after the first and second office visits (7-19-85 and 7-31-85) with the defendant doctor, and showed acceptable alignment of the broken bones.
1SI am most conscious that we should not reverse a finding of fact unless that finding is “clearly wrong” or “manifestly erroneous.” Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). But, Dr. Reyes never said that, if a cast was as described in the hypothetical question posed by plaintiffs’ counsel, then that cast should be changed. Instead, Dr. Reyes said that, if a patient had a loose cast, then he would make a determination (including use of an X-ray) of whether the cast was too loose and, if it was, then he would change it. Thus, there is a complete lack of expert testimony in support of the plaintiffs’ position on the determinative issue — whether the cast was too loose and so needed to be changed.
Also, although we do not re-weigh the evidence de novo on- appeal, Rosell, supra; Stobart, supra, I believe it is appropriate to briefly set Dr. Reyes’s testimony in the context of other medical testimony. Dr. Haddad was not asked for and did not express any opinion as to whether the cast had been too loose. Dr. Phillips looked at the X-rays of Amanda Torbert’s arm in the east that were taken on the July 10 accident date and on the July 19 and July 31 office visits. He stated that he was able to determine from the X-rays whether the cast was too loose. Dr. Phillips explained that air space between the east and the arm shows up as a black area on the x-ray while the cast, its padding, the flesh and the bone show up as shades of white. Dr. Phillips testified that he could see in the X-rays that the cast was not too loose. Dr. Stokes also looked at the same X-rays as Dr. Phillips and, like Dr. Phillips, testified that those X-rays showed that the cast was not too loose. The defendant doctor also examined the X-rays and, like Dr. Phillips and Dr. Stokes, testified that the X-rays showed that the cast was not too loose. In contrast, Dr. Reyes, who also looked at the X-rays, could not tell from them whether or not the cast was too loose and, in fact, he testified that he could never tell from x-rays whether or not a cylindrical cast was too loose. The only doctor who saw the cast on Amanda Torbert was the defendant doctor and he, of course, testified that the cast was not too loose.
We cannot assume that Dr. Haddad’s treatment with respect to the post-surgical cast he applied can be compared with the defendant doctor’s treatment with respect to the post-injury east he applied. First, Dr. Haddad’s cast covered two surgical incisions, which he may have needed to check. Second, there were metal screws and plates in the arm which may have helped maintain alignment during a cast change and which may have required ^viewing the arm itself from complications connected with them. Third, Dr. Haddad did not use a plastic cast as did the defendant doctor. In any case, none of the medical expert testimony compared the two doctors’ treatments as to their respective casts or even suggests such a comparison.
The plaintiffs also briefly argue that the defendant doctor did not see Amanda Tor-bert often enough for follow-up visits after the cast was applied. It is undisputed that the defendant doctor saw Amanda Torbert for follow-up visits nine days and twenty-one days after the cast was applied and that he did not see her again until six weeks after the cast was applied.
None of the doctors who testified criticized this frequency of follow-up visits. The only medical testimony explicitly addressing the issue was that the frequency of follow-up visits was sufficient. Dr. Haddad said that he would follow up and take x-rays “probably” once a week for “three or four” weeks. Dr. Reyes said that “practice varies” but that he would take x-rays weekly for three weeks. But it is undisputed that, as of the July 31 *1222 follow-up visit and x-ray i.e. three weeks after the cast was applied, the broken bones were still in acceptable alignment. The ma-lalignment occurred after July 31 and prior to August 21. Thus, it is undisputed that the malalignment did not occur during the three week period in which it was necessary to follow-up and X-ray with frequency. Thus, there is no expert testimony that the frequency of follow-up visits was insufficient.