NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 CA 0449

STEPHEN C. WHITE

VERSUS

DR. ARVIND YERTHA, DR. THEEPA THAYALAKULASINGAM, ANGELA PALMISANO, R.N., MARY BETH FRECHE, R.N., LORI D. RIVET, R.N., NORTH OAKS HEALTH SYSTEM AND/OR NORTH OAKS MEDICAL CENTER, LLC, LAMMICO RISK RETENTION GROUP, INC., AND/OR LAMMICO, LHA PHYSICIANS' TRUST AND ABC INSURANCE COMPANY

*DATE OF JUDGMENT:*   DEC 2 2 2022

ON APPEAL FROM THE TWENTY FIRST JUDICIAL DISTRICT COURT
PARISH OF TANGIPAHOA, STATE OF LOUISIANA
NUMBER 2019-0004031, DIVISION F

HONORABLE WILLIAM S. DYKES, JUDGE

* * * * * *

Curtis Locke Meredith, Jr.
Collins Meredith
Mitchell Meredith
Sean D. Fagan
Baton Rouge, Louisiana

Counsel for Plaintiff-Appellant
Stephen C. White


Jocelyn Renee Guidry
Craig J. Robichaux
Mandeville, Louisiana

Counsel for Defendants-Appellees
Arvind Yertha, MD, Theepa
Thayalakulasingam, MD, Angela
Palmisano, RN, Mary Beth Freche,
RN, Lori D. Rivet, RN, Hospital
Service District No. 1 of Tangipahoa
Parish d/b/a North Oaks Health System

and/or North Oaks Medical Center,
LLC

* * * * * *

BEFORE:  THERIOT, CHUTZ, AND HESTER, JJ.

**Disposition: AFFIRMED.**

2

**CHUTZ, J.**

Plaintiff-appellant, Stephen C. White, appeals the trial court's summary judgment dismissal of his medical malpractice claims against defendants-appellees, Drs. Arvind Yertha and Theepa Thayalakulasingam, Nurses Angela Palmisano, Mary Beth Freche, and Lori Rivet, and Hospital Service District No. 1 of Tangipahoa Parish d/b/a North Oaks Medical Center (NOMC),[1] as a result of having developed deep tissue injuries (DTI) while in NOMC's Surgical Intensive Care Unit (SICU). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of November 18, 2015, White underwent a left shoulder arthroscopy surgical procedure at NOMC following which he was placed on a ventilator. Later that evening, while intubated, White was admitted to the SICU and administered Propofol to maintain sedation. He remained in a left-arm immobilizer apparently positioned on his body as a result of the surgical procedure.

It is undisputed that in November 2015, White weighed 440 pounds, was diabetic, and suffered from malnutrition. At noon on November 20, 2015, Nurse Rivet, a registered nurse (RN) with specialized training in wound care who worked with the NOMC wound care department, was contacted by a SICU primary nurse, requesting a different bed for White. According to Nurse Rivet's note recorded at the time of the request, White's weight and size "doesn't allow for sufficient turn/position space in present bed." Within 13 minutes, Nurse Rivet ordered a "Burke triflex /48" with synergy overlay" bed (48" bed). Nevertheless, White developed a DTI, which was discovered on November 20th at 7:01 p.m. According to White's medical record, he did not have a preexisting DTI upon his admission to

---

[1] Although in filing this lawsuit, White identified "NORTH OAKS HEALTH SYSTEM AND/OR NORTH OAKS MEDICAL CENTER, LLC" as the hospital at which he received medical treatment, in its responsive pleading, NOMC noted its correct name and that it is a hospital service district, which is a political subdivision of the State of Louisiana.

3

the SICU. Although the DTI appeared before the arrival of the 48" bed, at some time on November 20th, White was moved from the standard SICU specialty bed and placed in a bariatric specialty bed. On November 23rd, White was placed into the 48" bed that Nurse Rivet had ordered.

After submission of his medical malpractice claim to a medical review panel (MRP), White filed this lawsuit on December 20, 2019, seeking damages as a direct result of alleged deviations from the medical standard of care by NOMC and the named defendants who were the healthcare providers that had rendered medical treatment to him (collectively the NOMC defendants). White averred that as a result of multiple DTIs that formed during his stay in NOMC's SICU, he was transferred to a wound care facility where he received inpatient care for a week, followed by four months of outpatient care.

The NOMC defendants answered White's lawsuit, generally denying White's allegations.[2] On October 20, 2020, the NOMC defendants filed a motion for summary judgment, averring that since White had failed to identify an expert to testify in support of his medical malpractice claims, they were entitled to a dismissal. White filed a timely opposition and, after four continuances to accommodate White, a hearing was held on July 19, 2021. The trial court rendered summary judgment in favor of the NOMC defendants, dismissing White's claims against them. A motion for new trial filed by White was denied by the trial court. White devolutively appealed both judgments.

---

[2] LAMMICO, whom White also named as a defendant and identified as a domestic insurance company that provided coverage for damages caused by the medical negligence of Palmisano, Freche, and Rivet, and LHA Physicians Trust, whom White additionally named as a defendant and identified as a company authorized to do business in Louisiana that provided coverage for damages caused by Drs. Yertha and Thayalakulasingam, also answered the lawsuit.

4

## DISCUSSION

After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). An issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. *Smith v. Our Lady of the Lake Hospital, Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730, 751.

The burden of proof rests with the movers. La. C.C.P. art. 966(D)(1). If, however, the movers will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the movers' burden on the motion does not require them to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(D)(1).

The motion for summary judgment at issue here arose in the context of a suit for medical malpractice. To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794; *Samaha v. Rau*, 2007-1726 (La. 2/26/08), 977 So.2d 880, 883-84. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. *Id.*, citing *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So.2d 1228.

5

It is undisputed, and the answers to interrogatories and requests for production of documents that the NOMC defendants attached to their motion for summary judgment show, that White has not produced a medical expert to support his medical malpractice claim. The NOMC defendants also attached to their motion the MRP's unanimous opinion, wherein the members opined that insofar as Drs. Yertha and Thayalakulasingam and Nurses Palmisano, Freche, and Rivet, the evidence did not support the conclusion that any of these healthcare providers failed to meet the applicable standard of care. The MRP expressly reasoned that, based on the records, White was appropriately managed following his surgery. Relevant to the issues raised in this appeal, the MRP found that because of the nature of the surgery, White was limited in the ways he could be positioned; delivery of the 48" bed probably would not have prevented the development of the DTIs; and the bed that White was placed in during his stay at the SICU was appropriate. As to NOMC, the MRP unanimously concluded that there was nothing in the record presented that indicated NOMC or its employees deviated from the standard of care.

In response to the NOMC defendants' showing, White pointed to excerpts of Dr. Yertha's deposition testimony as well as portions of Nurse Rivet's deposition testimony to assert that he demonstrated the necessary elements to support his medical malpractice claim.[3] White maintains that Dr. Yertha's and Nurse Rivet's collective testimony showed that the standard of care was that White be turned or repositioned every two hours.[4] Further, White asserts that the evidence established

---

[3] Although in his opposition to the NOMC defendants' motion for summary judgment White asserted that summary judgment was precluded only because an outstanding issue of material fact existed as to whether the standard of care had been breached, at the hearing he elaborated that his evidence supported findings as to the standard of care and causation.

[4] Because of White's size, Nurse Rivet explained that he could be repositioned, rather than turned, even in a standard bed. She described the technique in detail, elaborating how a patient can be tilted, including from side-to-side, and that to reduce the risk of a DTI or other pressure injury, the tilt should be at least 20 or 30 degrees.

the NOMC defendants breached that standard, and because he suffered "the exact injuries the preventative measures were intended to prevent," an outstanding issue of material fact existed as to whether the breach was the cause of his injuries.

Pressure injuries are bed sores. According to both Dr. Yertha and Nurse Rivet, a DTI is a pressure injury that occurs at a deeper level than the skin, involving the interface of muscle and fat. White's weight and size, coupled with his intubated, sedated condition, made him more vulnerable to pressure injuries like DTIs. Both healthcare providers also suggested that because turning or repositioning of a patient in White's condition was essential to his care, if there were insufficient room for the nurses to turn or reposition White, a larger bed was necessary. Dr. Yertha deferred to the expertise of the SICU nurses in the evaluation of whether a patient was too large for the bed to allow sufficient turning or repositioning. Nurse Rivet testified that as part of a wound care consultation, she ordered the bed at the request of the primary SICU nurse who indicated that White's weight and size did not allow for "sufficient turn/position space." Because she never saw him in person, Nurse Rivet assumed that the primary SICU nurse's report of White's size was true.

During Nurse Rivet's deposition, a lengthy colloquy ensued as to whether pressure injuries were preventable. Nurse Rivet conceded that Medicaid and Medicare do not pay for pressure injuries that occurred while a patient is in a hospital's care if the injury did not preexist his admission, because the government standard is that pressure injuries are avoidable. But she said that the National Pressure Injury Association Panel (NPIAP) was trying to change that standard since the NPIAP has determined that some pressure injuries are unavoidable. She elaborated that an unavoidable pressure injury is one where the documentation supported that the patient had been turned every two hours but a pressure injury

7

nevertheless developed. Explaining that the day a discoloration is visible on the patient is not the day that the pressure injury actually occurred, Nurse Rivet applied the NPIAP standard and determined the minimum day that a DTI can commence is three days before the blister is visible, and the maximum day is five days before the blister is visible. Nurse Rivet suggested, therefore, that it was possible something happened to White prior to admission to cause the DTI and that it only became visible once he was in SICU's care. She acknowledged that as a 440-pound, diabetic, who was poorly nourished, White was more at risk and warranted a speedier implementation of interventions as compared to others without the same risk factors.

The testimonies of Dr. Yertha and Nurse Rivet are insufficient to set forth the standard of care under the facts of this case. Dr. Yertha conceded that he was not the right person to answer questions about pressure injuries, deferring to either someone in the wound care department or a surgeon. Nurse Rivet detailed the difficulties with pinpointing the times and rates of the DTIs that White developed, explaining the usual minimum and maximum rates of development while acknowledging that White's risk factors could affect those determinations. She also challenged the accuracy of the governmental standards in regard to Medicaid and Medicare coverage for pressure injuries, indicating that in her opinion some pressure injuries are unavoidable regardless of whether a patient has been turned or repositioned every two hours.

Based on the summary judgment evidence, it is apparent that the determination of the standard of care requires an assessment of White's medical history, including the implications of the November 18th surgical procedure he underwent as a result of which he was intubated, sedated, and in a left-arm immobilizer prior to his admission into the SICU. The standard of care

8

determination also must factor the consequences of White's risk factors and the effect that any acts and/or omissions by the NOMC defendants may have had on him. As such, expert medical testimony was necessary for a proper assessment of White's medical malpractice claim. See and compare *Guardia v. Lakeview Reg'l Med. Ctr.*, 2008-1369 (La. App. 1st Cir. 5/8/09), 13 So.3d 625, 630 (connection between plaintiff's pressure injuries and his claims that the failure to regularly change his position for the first two days following surgery involved a complex medical condition beyond the province of lay persons to assess and was not similar to the alleged negligence of a physician leaving a sponge in the patient's body or the amputation of the wrong leg).[5]

Moreover, even if we were to accept White's contention that Dr. Yertha and Nurse Rivet established that the standard of care was that he should have been turned or repositioned every two hours, he still could not prevail. White maintains the record contains sufficient evidence of a breach of the turn/reposition-every-two-hours standard of care. But neither Dr. Yertha nor Nurse Rivet testified that White was not turned every two hours.

Dr. Yertha testified that he trusted the nurses to do what they needed to do, including repositioning and turning patients like White, adding that he knew nurses routinely repositioned patients. Nurse Rivet stated multiple times that her knowledge of the events affecting White were limited to the 14-pages of his medical record that she had reviewed before the deposition and, therefore, she did not have an in-depth knowledge to share.[6] Nurse Rivet also did not know whether White was turned every two hours, again testifying that she had not looked at all the documents in his medical record. Based on standard nursing practice, Rivet

---

[5] Because Nurse Rivet's testimony is insufficient to establish the standard of care, we pretermit a discussion on whether she is qualified to offer expert opinion as to any alleged malpractice by Drs. Yertha and Thayalakulasingam. See La. R.S. 9:2794(D).

[6] White's medical record consists of several thousand pages.

9

assumed that White had been repositioned before she was initially contacted about ordering the 48" bed.

Thus, the only evidence that could support a breach in the turn/reposition-every-two-hours standard of care is Nurse Rivet's record of a hearsay statement from a primary SICU nurse indicating that the specialty bed in which White was initially placed did not allow "sufficient turn/position space." If we were to assume a trier of fact could infer from that statement that White was not turned or repositioned every two hours, the record is nevertheless devoid of any evidence to support a causal connection between the breach and his injuries, an element of the medical malpractice claim for which White was required to produce factual support sufficient to establish the existence of a genuine issue of material fact. Nurse Rivet testified that some DTIs are unavoidable. She also explained the minimum and maximum rates of development of DTIs for typical patients while acknowledging that White had risk factors that made him atypical. The lack of expert testimony explaining the relationship between turning or repositioning White every two hours and the inevitable development of White's DTIs created an absence of evidence to support a finding of a causal connection between any breach in the standard of care and the injuries.

Accordingly, the trial court correctly granted summary judgment. And in light of our conclusion, the trial court did not abuse its discretion in denying White's motion for new trial.

## DECREE

For these reasons, the trial court's judgments, granting summary judgment dismissal of White's claims against Drs. Yertha and Thayalakulasingam, Nurses Angela Palmisano, Mary Beth Freche, and Lori Rivet, and Hospital Service District No. 1 of Tangipahoa Parish d/b/a North Oaks Medical Center and denying

10

his motion for new trial, are affirmed. Appeal costs are assessed against plaintiff-appellant, Stephen C. White.

**AFFIRMED.**