| «¡WATKINS, Judge.
This medical malpractice case results from a patient’s 12-day stay in Thibodaux General Hospital (Thibodaux General) following an automobile accident in which the patient, Carolyn Clause Broussard, received serious injuries. She and her husband, Silveste Clevelin Broussard, filed suit against the hospital and two doctors[2]: Dr. Claudio V. Guillermo, Jr., the general surgeon who managed Mrs. Broussard’s case; and Dr. Neil J. Maki, the orthopedic surgeon who operated on the patient’s fractured hip. The respective insurers were also named as defendants. A bifurcated trial on the merits was held, with the case against the two doctors decided by a jury and the case against the hospital decided by the trial judge. The jury returned a verdict in favor of the doctors, finding they did not lack the necessary skill or fail to use reasonable care; the jury did not reach the issue of causation. The trial judge ruled in favor of the hospital, finding that plaintiffs failed to prove any neglect or breach of duty on the part of the hospital and failed to prove causation.
Our review of the record convinces us plaintiffs failed to prove Mrs. Broussard’s injuries were caused by the actions of either of the two doctors or the hospital. We affirm.
FACTS
Counsel for Dr. Guillermo has provided us with an accurate recitation of the undisputed facts supported by the record, which we quote:
In the late evening hours of February 25, 1990, the Broussards, while driving to their home in St. Mary’s Parish were involved in a serious automobile accident in Thibodaux, Louisiana.
Mrs. Broussard arrived unconscious at the Emergency Room of Thibodaux General Hospital at approximately 11:20 p.m. It was documented in the | «¡Emergency Room record that Mrs. Broussard was a passenger involved in a motor vehicle accident, she had no seat belt on and struck the windshield. On initial physical examination it was observed that Mrs. Broussard had a subdural hematoma, fractured hip, fractured ribs and rotated left foot. Several tests were ordered by the Emergency Room physician including a CBC, SMA-9, cross table x-ray of the C-spine and a skull CT of the head, neck and abdomen.
Because of Mrs. Broussard’s life threatening condition she was admitted to ICU, intubated and placed on a ventilator. Dr. Claudio Guillermo, a general surgeon, was consulted for management of her multi-trauma condition.
Dr. Guillermo arrived at the hospital to manage Mrs. Broussard’s multi-trauma condition at approximately 2:05 [a.m.] on the 26th. One of the first acts by Dr. Guillermo was to request a consult by Dr. Warren Williams, a neurosurgeon, for evaluation of the trauma to Mrs. Broussard’s head. Dr. Williams reviewed the CT scan and felt Mrs. Broussard had a left side epidural hematoma. Dr. Williams elected to treat Mrs. Broussard’s head injury unoperatively. [Footnote omitted.]
Dr. Guillermo obtained what pertinent medical history he could from Mr. Brous-sard, who was also injured and treated at the Emergency Room. Mr. Broussard informed Dr. Guillermo that his wife had a history of recurrent “kidney infections”.
*1362 Dr. Guillermo also gleaned from the lab results that Mrs. Broussard’s BUN (50) and creatinine (5.2) levels were both elevated.
Dr. Guillermo, a general surgeon, never performed surgery on Mrs. Broussard. However, because Mrs. Broussard was a multi-trauma patient, Dr. Guillermo’s role as a general surgeon was to consult and coordinate the appropriate specialists to handle Mrs. Broussard’s numerous conditions. Dr. Guillermo observed the elevated BUN and creatinine levels and with Mrs. Broussard’s history of recurrent kidney infections, Dr. Guillermo promptly consulted Dr. Leo Hebert, an internist. Dr. Hebert examined Mrs. Broussard and contacted her prior treating physician, Dr. Amy in Abbeville, who informed Dr. Hebert that Mrs. Broussard had a chronic (longstanding) renal insufficiency due to a congenital defect. One of Mrs. Brous-sard’s kidneys had not properly developed and the [other] kidney was not functioning at full capacity. Mrs. Broussard at the time of admission to Thibodaux [General] had a kidney filtration rate of 15-20% of normal capacity.
Dr. Hebert’s recommendation to Dr. Guillermo was that Mrs. Broussard’s kidney condition was a longstanding chronic problem which at that time did not need any additional treatment. Dr. Hebert suggested that Mrs. Broussard follow-up with a nephrologist upon discharge from the hospital.
During the course of her stay at Thibo-daux [General], on x-ray Mrs. Broussard developed a widening of the mediastinum. It was Dr. Guillermo’s opinion that there may [have] be[en] a leak in a bloodvessel leading to the heart. Dr. Guillermo consulted Dr. Phil Robichaux, a thoracic and vascular surgeon. Dr. Robichaux ordered an angiogram in order to determine whether she indeed had a tear. To perform the angiogram, a dye was injected into Mrs. Broussard....
Dr. Leo Hebert was again consulted on February 28, 1990 by Dr. Guillermo to manage Mrs. Broussard’s hypertension. Dr. Hebert elected to treat the hypertension with a medication — Capoten_
Dr. Guillermo also requested an ortho-paedic consult to care for the fracture/dislocation of Mrs. Broussard’s left hip. This was initially answered by Dr. Steven Morris on February 26, 1990. Dr. Morris attempted to reduce the left [hip] fracture by placing Mrs. Broussard in traction. The fracture again became displaced. Surgery was then recommended. Dr. Morris was concerned that ... Mrs. Broussard’s hip condition could result in necrosis of the hip region. [Necrosis is where the blood supply is cut off.] Because Mrs. Broussard was obese, and not mobile, she was also at risk for developing a clot. Dr. Morris turned [over] Mrs. Broussard’s orthopaedic care to Dr. Neil Maki on March 4, 1990. Dr. Maki evaluated Mrs. Broussard for surgery.
Dr. Neil Maki first examined Mrs. Broussard and reviewed her chart on March 4, 1990. Dr. Maki also discussed her medical history, both with the Brous-sards, Dr. Guillermo, Dr. Morris and Dr. Williams. On March 6, 1990, after gaining medical clearance that morning from Dr. Williams, Dr. Maki performed an open reduction internal fixation (ORIF) of left ace-tabular fracture and debridement of Mrs. Broussard’s left hip. Because Dr. Maki was placing two cannulas screws with washers in Mrs. Broussard’s hip to reduce the fracture, prophylactic antibiotics were deemed necessary and were prescribed by Dr. Maki.
In Dr. Maki’s opinion, Mrs. Broussard was at risk for a post-surgical infection. Mrs. Broussard had catheters in place which could be a conduit for infection, and the metal implants are orthopaedically a well known source for infection_ Dr. Maki selected Mandol and gentamicin for the short term prophylactic antibiotic coverage.... The first dose was given on March 6, 1990 during the operative procedure, the last dosage early on the morning of March 10.
*1363 Dr. Guillermo reviewed the post-operative orders and noted that Dr. Maid had ordered gentamicin.... Dr. Guillermo was of the opinion that the benefits of the gentamicin outweighed the risks to Mrs. Broussard.
On March 9, 1990, three days after surgery, Mrs. Broussard began having seizures. Dr. Guillermo again consulted Dr. Williams. Dr. Williams treated the seizures with anti-convulsants (dilantin) and diuretic medication. Dr. Williams noted in the chart that Mrs. Broussard’s seizures were secondary to her cerebral contusion and ordered a repeat CT scan of the head.
Dr. Guillermo, concerned about Mrs. Broussard’s seizures, consulted another specialist, Dr. Srinivas ftGangi, a neurologist. Dr. Gangi performed an examination and review of Mrs. Broussard’s medical history. Dr. Gangi diagnosed Mrs. Brous-sard’s seizures as secondary to cerebral contusions. Dr. Gangi opined that Mrs. Broussard exhibited signs of left paralysis with an injury to the right side of her brain, a 1 to 1 direct ratio in neurology.
Because the CT scanner was not operable at Thibodaux Hospital, Dr. Williams had Mrs. Broussard transferred to Terre-bonne General Hospital [Footnote omitted.] After admission to Terrebonne General Hospital, Mrs. Broussard was diagnosed as being in renal compromise and was started on dialysis. On May 7, 1990, Mrs. Broussard was discharged from the rehabilitation unit at Terrebonne General Hospital.
LITIGATION
On December 12, 1990, Mr. and Mrs. Broussard filed a medical malpractice claim against Drs. Mató, Hebert, and Guillermo and against Thibodaux General with the Commissioner of Insurance pursuant to LSA-R.S. 40:1299.47 et seq. The theory of the Broussards’ claim was that the use of gentamicin in the quantities prescribed by Dr. Mató, with the knowledge of Dr. Guillermo, was a breach of the standard of care owed the patient who had a pre-existing chronic renal insufficiency, and that the breach caused the patient to suffer irreversible, end-stage renal failure.
A medical review panel hearing was held on March 4, 1993. The panel found: “The evidence does not support the conclusion that the defendants ... failed to meet the applicable standard of care as charged in the complaint.” Additionally, in written reasons for its opinion, the panel stated: “There is no evidence that the use of Gentamicin was the precipitating cause of irreversible renal failure” and “[t]he use of gentamicin was not contraindicated in this patient or any other patient who has impaired renal function.”
The Broussards’ medical malpractice claim went to trial on April 18, 1994, and the jury returned a verdict on April 22, 1994, finding that neither Dr. Mató nor Dr. Guillermo “lacked the required degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, with regard to the treatment of Carolyn Broussard....” On April 28, 1994, judgment was signed dismissing Rwith prejudice plaintiffs’ claims against all defendants except Thibodaux General and its insurer. On May 4, 1994, the trial judge signed a judgment dismissing Thibodaux General and its insurer and issued reasons for the dismissal, stating: “The plaintiffs have failed to prove by a preponderance of the evidence that the antibiotic administered to Mrs. Broussard caused or contributed to the loss of, or in any way, damaged her only functioning kidney.”
The plaintiffs appealed, urging a four-part “SPECIFICATION OF ERRORS AND ISSUES PRESENTED FOR REVIEW.”[3] Thereafter, counsel for plaintiffs informs this *1364 court in his brief that “[although some prejudicial errors happened in the trial court that are addressed below, plaintiffs wish to ... present the facts to this Court as a ‘clear error’ ease.”
Despite the plaintiffs’ “specification” and counsel’s remark, we find it unnecessary to address manifest error by either the .jury or the judge. As we noted previously, the jury did not reach the issue of causation, which is an essential element of plaintiffs’ medical malpractice case. Thus, even if we were to decide that the jury was clearly wrong in finding no breach of the standard of care by either doctor, we then would be placed in the position of examining the evidence de novo for proof of causation. Accordingly, in order to focus on the one requisite element that is common to plaintiffs’ causes of action against the three defendants in this case, we have performed this type of review. Our conclusion is the same conclusion reached by the medical review panel and by the trial judge: there is insufficient proof that gentamicin caused Mrs. Broussard’s ultimate renal failure.
JtCAUSATION
The plaintiffs assert they have proved that the dosage of gentamicin prescribed by Dr. Maki following surgery, which they allege was an overdose, caused Mrs. Broussard to suffer end-stage renal disease. “End-stage renal disease” is defined as a state in which a person cannot live without some form of renal replacement therapy, either one of several different types of dialysis or a kidney transplant. The plaintiffs claim the gentamicin caused the end-stage renal disease because it is a known nephrotoxic (kidney-damaging) medication.
Gentamicin (brand name “Garamyein”) was administered during surgery by Dr. Maki on the afternoon of March 6. Thereafter, Mrs. Broussard received 11 doses of 80 milligrams, with the first prescribed dose being administered at 9:00 p.m. on March 6 and the last prescribed dose being administered at 5:00 a.m. on March 10. Dr. Maki testified he uses gentamicin prophylactically, as a preventative, on a regular basis and sometimes in much higher doses. He specifically testified, “I’ll say what I had to say then and ... now, that Mrs. Carolyn Broussard needed the Gentamicin. She needed it in [the] high levels administered to her.”
Plaintiffs have voiced no complaint concerning the initial dose, the one administered during surgery. However, they assert that the 11 subsequent doses should have been reduced to 15 percent of the 80 milligrams, and that the last three doses should not have been given at all because Mrs. Broussard’s BUN and creatinine levels had risen on March 9. Additionally, plaintiffs claim Mrs. Broussard should have had BUN and creati-nine tests [4] between March | ¾2 and March 9. Although plaintiffs claim Dr. Maki should have performed those tests immediately pri- or to surgery, the alleged necessity is not supported by the record. The patient’s chronic renal insufficiency had already been established; the pre-anesthesia evaluation by the anesthesiologist on the morning of surgery states that the patient had increased BUN and creatinine. The failure to take a new BUN and creatinine test on March 6 does not relate to causation.
*1365 Dr. Leo P. Hebert, Jr. was the first doctor in Thibodaux to investigate Mrs. Broussard’s renal problems. He was called in for consultation when Dr. Guillermo noticed that the first BUN and creatinine readings taken at Thibodaux General were elevated. After determining that the readings were indicative of a chronic condition, Dr. Hebert did not see Mrs. Broussard again until he was called in to treat her high blood pressure. He testified that his efforts at that time were “to prevent further deterioration of renal function by high blood pressure.”
Plaintiffs claim they have proved gentami-cin caused Mrs. Broussard to suffer end-stage renal failure because there is evidence that her renal condition immediately after the accident, and before the surgery, was stable and asymptomatic. They point to Dr. Hebert’s testimony that her renal function had not changed as a result of the accident when he was called in for consultation. He testified that the elevated BUN and creati-nine readings at the time of her admission to Thibodaux General were “chronic” and not associated with the injuries for which she was being treated in the emergency room and in ICU. However, when pressed for his opinion that the automobile accident and its associated trauma was not a cause of her end-stage renal failure, the doctor would say only that while he was observing her she did not go into acute renal failure. He explained that he was not an expert in trauma and that [gtrauma is “unpredictable.” He said he was “uncomfortable” with ruling out the accident as a cause “because things can change after having been obviously stable for a while.” Although the stability of Mrs. Broussard’s renal condition during the early days of her stay at Thibodaux General may be proof that the accident did not cause her ultimate renal failure, that fact does not even relate to the allegation that gentamicin was the cause. On cross examination, Dr. Hebert testified that gentamicin potentially can cause severe renal toxicity, and he admitted that the risk of nephrotoxicity is greater in patients with impaired renal function. Dr. Hebert explained that as an internist his use of gen-tamicin was therapeutic, to treat a patient with an existing infection, not prophylactic, to prevent infection. He stated that if he had a patient with elevated BUN and creatinine levels, he would use some sort of formula to reduce the dose.
Dr. Hebert was asked directly if he thought that Mrs. Broussard went into acute renal failure as a result of the administration of gentamicin. He answered, “I think that the potential is there.” He explained his answer by referring to the “all or none rule”: “Nothing occurs a hundred percent of the time nor does it never occur.” Although counsel for plaintiffs attempted to upgrade his answer to “more likely than not,” Dr. Hebert remained with “the potential is there.” Despite this doctor’s refusal to change his assessment of causation, plaintiffs in their reply brief assert his “potential” answer is proof of causation. There is no merit to this assertion.
As further proof of causation, plaintiffs cite the testimony of Dr. Gerald D. Schuster, an orthopedic surgeon with a practice in Maryland, who testified for the plaintiffs via video deposition taken on June 18, 1993. It was his opinion that gentamicin was not a “typical drug to utilize as a prophylactic-type of antibiotic.” However, this testimony relates to the standard of care required of an orthopedic surgeon rather than causation.
| ipDr. Schuster testified that the risk of nephrotoxicity is greater in patients with impaired renal function and in those who receive high dosages or prolonged therapy. However, Dr. Schuster admitted he would defer to a nephrologist for “specific causation or additive causation” of Mrs. Broussard’s renal problems that required dialysis after her transfer to Terrebonne General.
Specifically, plaintiffs claim in their reply brief that causation was proved by “Dr. Schuster’s feeling that failure to treat the problem when it developed caused additional harm.” Dr. Schuster’s opinion was that if there had been appropriate monitoring after surgery, then the amount of aminoglycosides in her blood stream would have been noticed *1366 immediately; then measures to stop the medication and begin dialysis would have been instituted. We disagree with plaintiffs that this statement by Dr. Schuster relates to causation. Instead, he is faulting the treating physicians for a delay in starting dialysis rather than addressing the cause of the patient’s need for dialysis. Considering Dr. Schuster’s deference to a nephrologist for an opinion on both specific and additive causation, we find his testimony has no probative value in the determination of the cause of Mrs. Broussard’s end-stage renal failure.
Plaintiffs also submitted the testimony of a general surgeon, Dr. Robert A. Harwood of Tarzana, California. Although he discussed the characteristics of gentamicin and voiced an opinion as to the necessity of a reduced dosage in a patient with chronic renal insufficiency, his entire testimony addressed the standard of care for a general surgeon. Dr. Harwood’s testimony did not advance plaintiffs’ proof of causation.
Plaintiffs’ strongest proof of causation came with the testimony of Dr. Isaac Gorbaty of Sherman Oaks, California, who is board certified in nephrology and several other specialties, but not surgery or orthopedic surgery; about 50 percent of his practice is in nephrology. He examined the records from Thibodaux General and Terrebonne General Hospital (Terrebonne General) and he | nreviewed certain deposition testimony. Among Mrs. Broussard’s records from Ter-rebonne General was a “notation” by Dr. Sharon Paneoast, an internist who practiced there at the time. The notation read:
Opens eyes when told, but doesn’t follow commands. On dialysis at present. Metabolic derangement improving as expected [with] the dialysis. A history of ... by Dr. Suazo. Seems primary problem was based on chronic renal insufficiency made worse by Gentamicin treatment. Toxic random level here yesterday. No recurrent seizures since transfer.[5]
Dr. Gorbaty stated his opinion was that Mrs. Broussard suffered an acute renal failure secondary to the high toxic dose administration of gentamicin. He based that opinion on the level of gentamicin in the blood, 15.2, as revealed by the blood test performed at Terrebonne General the evening of the day she was transferred there. Dr. Gorbaty thought that level was a decrease from a probable higher level of 25 to 30. He interpolated from the blood level that the gentam-icin level in the kidney was extremely high, 70 to 90, stating that the blood level is about a third of the kidney level, a fact that he learned from biopsies of kidneys in rats and dogs. Dr. Gorbaty volunteered that his calculation was a conjecture based on his knowledge of how gentamicin distributes in body fluids and the kidney.
Dr. Gorbaty admitted that the dosage of gentamicin given to Mrs. Broussard was appropriate for “most adults.” Thus, even according to him, the dosage prescribed by Dr. Maki was not an overdose per se. However, Dr. Gorbaty, who is not a surgeon, considered gentamicin inappropriate for prophylactic use for patients who are not infected. The testimony he gave concerning proper dosages and monitoring related to the therapeutic use of | ^gentamicin. Furthermore, when asked about the prophylactic use of gentamicin as opposed to therapeutic use, he stated his opinion that prophylactic antibiotics for surgery should never be continued longer than 48 hours.
Dr. Gorbaty stated Mrs. Broussard went into complete acute renal failure on March 9, when her BUN was 138 and the creatinine was 9.1. He explained that usually within 24 to 48 hours post surgery the “kidney num *1367 bers” go up, because there is a reduction in the blood flow to the kidney of approximately 50 percent, but they usually come right back down. He testified that was not Mrs. Brous-sard’s situation. He believed “the superimposition of a nephrotoxic agent on top of a situation where her kidney blood flow was reduced temporarily made her kidney much more liable to be damaged.”
When asked about the timing of the renal failure, he stated that when you start with a creatinine of five and give “toxic” levels of gentamicin there will be a “shut down” in kidney function within 48 hours. Thus, he ruled out other medications and/or events as causes for the renal failure and reiterated his opinion that the gentamicin was the cause “on the basis of a toxic medication given in dangerously high levels.”
However, Dr. Gorbaty admitted that dialysis was a foreseeable necessity in Mrs. Broussard’s near future. Dr. Gorbaty testified that when Mrs. Broussard entered Thi-bodaux General, her one functioning kidney was able to clear the body of waste only one-fifth (20 percent) as well as a kidney that functioned normally. He stated that considering the degree of chronic renal insufficiency Mrs. Broussard exhibited upon entering Thibodaux General, she could have expected to go on dialysis within five years, reduced to one year if she suffered any other significant medical problem, such as hypertension, trauma to the kidneys or her body, or infections.
Dr. Gorbaty’s opinions were refuted by the testimony of two other nephrologists: Dr. Herminio Suazo-Vasquez, who was Mrs. | igBroussard’s treating nephrologist; and Dr. John D. Wallin, an expert witness called on behalf of the defendants.
Dr. Suazo-Vasquez, the nephrologist who treated Mrs. Broussard at Terrebonne General, testified that “from the beginning” it was his opinion that the gentamicin administered to Mrs. Broussard could not have been the cause of her acute renal failure. By “from the beginning” he meant from the first time he saw the patient, thus refuting any inference that he was the source of the statement Dr. Pancoast entered in her notes. When asked about the “fast” rise in creati-nine (5.5 on March 2 to 9.1 on March 9), Dr. Suazo-Vasquez said:
[T]hat was actually the reason I didn’t think it was Gentamicin, because nobody has ever said that if you have gentamicin nephrotoxicity your creatinine, which is that number, will start rising immediately. All the studies show that there is a time lag between the time that you give it and the time the creatinine starts going up. That time lag may be different, depending upon what study you read and depending on what actually was the parameter that they used to decide when it started going up, but nobody has ever said that it’s going to start immediately.[6]
One reference Dr. Suazo-Vasquez consulted established the time lag was five to ten days. He found another reference that said the likelihood of developing toxicity was higher in a kidney patient, but none that said it could be sooner. There was even one reference that said the likelihood should not be greater. He stated it was possible that it could happen sooner, but he did not say it was more probable than not. He said that more probably than not the incidence of gen-tamicin-related toxicity to the kidneys does not begin until five to ten days after the start of the gentamicin.
Dr. Suazo-Vasquez did not know about Dr. Pancoast’s notation until he got to court. He denied saying to Dr. Pancoast that “the | ^primary problem was a baseline chronic renal insufficiency made worse by gentami-cin.” At the time of her admission to Terre-bonne General, Dr. Suazo-Vasquez even told Dr. Mató that gentamicin was not a suspected cause. He explained:
*1368 [T]he people on the case were talking about Gentamicin at the time that we arrived on the case, and I remember educating my assistant and the people there, told them how somebody who does not know much about Gentamicin toxicity can have an erroneous interpretation of the facts, and I went through this kind of discussion that I said about the timing, and I said, “If you ask a nephrologist, I would say that Gentamicin should not be up in the list of suspected causes.”
Thus, Dr. Suazo-Vasquez decided gentami-cin was not the cause of Mrs. Broussard’s renal failure at a time when litigation was not a factor, and at that unsuspicious time, he told others his opinion. His testimony was unrefuted at trial.
Elaborating further, Dr. Suazo-Vasquez stated that not everybody agrees that a preexisting kidney dysfunction will predispose a person to more incidents of kidney failure with the use of something (like gentamicin) that is nephrotoxic. Although he admitted that one is predisposed to getting complete acute irreversible renal failure when one receives high dosages of gentamicin, and that it was fair to say the 11 additional doses of 80 milligrams was “too much,” he went on to say that even when “good levels” are kept, kidney failure related to gentamicin can occur.
The crux of the testimony by Dr. Suazo-Vasquez, Mrs. Broussard’s treating nephrologist, was that he excluded gentamicin as the cause of her end-stage renal failure. He repeated, “[T]he literature says you need several days, and those days [in number] are above what it was in the ease of Carolyn [Broussard].”
Defense witness Dr. John D. Wallin is a professor of medicine and chief of the Section of Nephrology at Louisiana State University School of Medicine in New Orleans, Louisiana. He agreed with Dr. Suazo-Vasquez concerning the timing of the nephrotoxic effect of gentamicin, and he disagreed with Dr. Gorbaty on several points.
[ isDr. Wallin’s opinion of the cause of Mrs. Broussard’s renal failure was a change in blood pressure during the process of surgery and anesthesia on March 6.[7] He testified that kidney disease and high blood pressure (hypertension) are causally related: one can cause the other. He explained that “hypo-tension” means low blood pressure. He stated:
People who have impaired renal function to this degree are very, very susceptible to small changes in blood volumes, and small changes in blood pressure can cause very rapid deterioration in kidney function.... [I]t doesn’t take much, because ... the impaired kidney is susceptible to these types of changes, and very commonly ... they don’t recover. They ... have end-stage renal disease. We have to begin dialysis- [Y]ou can see this with something as simple with someone with far advanced renal failure that vomits a lot or has diarrhea or is in some kind of a traumatic situation.[8]
[[Image here]]
She probably lost a considerable amount of blood into the areas where she had the broken bones, so that immediately decreases blood volume, and it sets the stage for a situation in which you can get further damage to the kidney.
Dr. Wallin explained, “The major reason that I would place [the process of surgery and anesthesia] at the top of the list is the timing of when it appears that her renal function deteriorated.” Although there were no creatinine readings between March 2nd and 9th, the doctor pointed to her urine flow as a “rough index” of what was happening to her kidney at that time. He believes that the day of the surgery she had the event that *1369 caused her kidney function to deteriorate. She began surgery with a blood pressure of 150/80; then it dropped during a period of a half hour to the “low side,” down below 90.
Dr. Wallin testified, “I think that this has the highest degree of medical probability of being the cause of this woman’s deteriorated renal function_” He continued, “Mrs. Broussard, | ^because of her prior renal insufficiency was “particularly vulnerable to traumatic events and things that disturb the circulation [hemodynamic events]. I’m not certain that that applies to nephrotoxic events.”
Although Dr. Wallin admitted that in his practice he did not use gentamicin prophylac-tically, he discounted it as a cause. He stated that although gentamicin is one of the common things that produce acute renal failure, gentamicin has some “fairly unique characteristics,” one of which is the time course. He continued:
“The time course ... is regardless of whether the patient is receiving a lot of it or a little bit of it. It tends to accumulate in tissues, and it’s only after a period of averaging four to seven days, certainly not before the third day, that you begin to see any kinds of diseases in the kidney related to the Gentamicin. It requires tissue accu-mulation_ There is a time lag.
[[Image here]]
[I]n my experience and those of my colleagues, the average period that you begin to see nephrotoxicity from Gentamicin is six days.... I know of no reports that if patients have worse renal function that giving the appropriate doses of Gentamicin cause renal failure at any earlier point in time (than an average of six days).”
Dr. Wallin testified the second characteristic of gentamicin is usually it is associated with an increased urine flow. The urine output goes up because gentamicin can interfere with the ability of the kidney to concentrate urine. Because Mrs. Broussard had a drop in urine output, Dr. Wallin did not believe her condition “in any way could be related to the Gentamicin therapy that was begun on the 6th.... ” When asked if you can have allegoric (drop in urine flow) reaction when you have aminoglycoside-induced nephrotoxicity, the doctor replied, “It’s exceedingly unusual.”
Connecting the two characteristics of gen-tamicin, Dr. Wallin stated, “[W]hen we see renal failure in a patient that’s receiving Gentamicin and it’s not allegoric and the period is only three or four days, then we look someplace else for another cause.” When asked whether Mrs. Broussard had reached the stage of acute irreversible renal function on March 9, he answered he could not make that conclusion. He said some people reach a serum creatinine [ i7of 9.0 and recover to levels of previous renal function. He noted Mrs. Broussard’s situation was “somewhat forced” by a serum potassium level of 7.6 on March 9, a life threatening serum potassium that forced the nephrologist to dialyze her. He explained, “[I]n addition, our experience is that, very commonly, when you take someone that has far advanced renal failure, as this patient did, and put them on dialysis, you effect other changes in the circulation which often renders the patient at end-stage renal disease.” When asked about the three doses Mrs. Broussard received after the high creatinine reading on March 9, he said they had “very little” to do with her subsequent renal failure.
Concluding his testimony that the hypoten-sive episode during the surgery was the causative event, Dr. Wallin explained, “[Y]our literature that you have is quite clear that reductions in blood flow and hemody-namic changes associated with surgery ... [have] ... a fairly immediate effect, characterized by the resulting fall in urine output that we saw immediately with surgery.”
Dr. Wallin’s estimate of when Mrs. Brous-sard would have needed dialysis differed from that of Dr. Gorbaty. He stated that Mrs. Broussard had a “moderately severe impairment of kidney function” when she entered Thibodaux General. “[W]hen we see people who have serum creatinines that are *1370 in the range of 5.5 to 6.0 ... if she came to my clinic, I would make preparation to plan on putting her on dialysis within six months to a year_” The record reveals that Mrs. Broussard was admitted to the hospital in Abbeville, Louisiana, during September of 1989, some five to six months before her surgery, with a creatinine reading of 6.4.
Another defense witness gave significant testimony regarding causation. Dr. Joseph Rauchwerk is a board-certified orthopedic surgeon who served on the medical review panel that rejected plaintiffs’ claim against three doctors and the hospital. Dr. Rauch-werk acknowledged that if a patient has impaired renal function and an elevation of the creatinine clearance and the BUN, usually the dosage is adjusted according to the results of the | igrenal functions tests. However, he stated that it is “well known” that a concentration of gentamicin administered in higher dosage than this patient was given may not alter the renal function at all. Dr. Rauchwerk examined the hospital records and concluded that the 80 milligram dosage three times a day, for a total of 240 milligrams per 24 hours, was a “safe dosage” of gentamicin. He stated, “So she did not receive a toxic dosage of Gentamicin.”
Dr. Rauchwerk was emphatic about the distinction between the prophylactic antibiotic treatment used in an orthopedic procedure or a blunt trauma case, such as Mrs. Brous-sard’s, and the therapeutic use of gentamicin to combat an existing infection. In his field of orthopedic surgery, Dr. Rauchwerk noted that with a polytrauma patient, a higher dosage of gentamicin is indicated to get appropriate tissue penetration. He stated he rendered his opinion on the medical review panel on the basis that the doctors were treating a polytrauma patient who not only had multiple injuries but who was seriously ill and in need of antibiotics. He explained that in the United States and around the world, gentam-icin is administered in a number of institutions in polytrauma eases where there is no availability to get “peak and trough levels.” Dr. Rauchwerk was shown the charts in the Physician’s Desk Reference (PDR). Dr. Rauchwerk did not equivocate; he stated that “nephrotoxicity is basically related to toxic doses.... There is no clearly established evidence that dosage of Gentamicin, even in a case of impaired renal function, causes nephrotoxicity. The direct relationship ... in a double-blind study has never been established to my knowledge.”
Despite being reminded that Mrs. Brous-sard went on dialysis, he reiterated, “I see no connection between Gentamicin and nephro-toxicity in this case.” When asked whether there was any evidence before the medical review board that gentamicin was a precipitating cause of irreversible renal failure in Mrs. Broussard’s ease, Dr. Rauchwerk replied, “None whatsoever.” However, he agreed with counsel for the plaintiffs that the | ^question of causation relative to toxicity and gentamicin and ultimate nephrotoxicity “would very much belong with a nephrologist.”
Even when questioned about the 15.2 level of gentamicin in Mrs. Broussard’s blood stream at the time of her admittance to Terrebonne General, Dr. Rauchwerk stated, “No toxicity has been established.” He merely conceded that it had the potential of becoming harmful.
The 15.2 (micrograms per milliliter) blood level of gentamicin shown in the test performed at Terrebonne General was explained by Dr. Maki. He stated that the recommended therapeutic levels are between five and ten. He testified that only when the patient experiences levels over 12 for five to 10 days will there be renal problems, and those usually would be reversible. He specified that the 15.2 level was a “toxic level” only if it was maintained for several days. Dr. Maki testified that “toxicity of the drug or the effect on the kidney is ... correlated with time and the prolonged nature of the administration of the drug.”
Despite the contrary expert medical testimony, plaintiffs contend in their reply brief that “the toxic level of Gentamicin found in the blood upon transfer to Terrebonne General” was proof of causation. There is no merit to this contention.
*1371 CONCLUSION
On the basis of our review of the complete record[9] in this case, we conclude that the evidence indicating that gentamicin was the sole cause or a substantial, contributing cause of the patient’s renal failure is not persuasive. Other causes are at least as equally plausible. Compare Cangelosi v. Our Lady of the |2qLake Regional Medical Center, on rehearing, 564 So.2d 654, 669 (La.1990). Plaintiffs have therefore failed to prove that, more probably than not, Mrs. Broussard’s injury was caused by the negligence of Dr. Maki, Dr. Guillermo, or Thibodaux General. We find no evidence in the record that had gentamicin not been prescribed in the dosages that Mrs. Broussard received she would not have reached end-stage renal failure when she did.
Thus, assuming for the sake of argument that the doctors and the hospital breached the standard of care they owed the patient, plaintiffs’ proof falls short of satisfying their burden. A plaintiff in a medical malpractice action must establish, with adequate evidence, a causal connection between his injuries and the negligence of the defendant. Compare Pfiffner v. Correa, 94—0924, 94—0963, 94—0992 (La. 10/17/94), 643 So.2d 1228. We find that the plaintiff has not established the requisite element of causation in this medical malpractice action.
Accordingly, we affirm the judgments of the trial court, and we assess plaintiffs with the costs of this appeal.
AFFIRMED.

. Dr. Leo P. Hebert, Jr., an internal medicine specialist who was called in for consultation during Mrs. Broussard's hospital stay in Thibodaux, Louisiana, was included in the proceedings before the medical review panel on March 4, 1992, but was not named a defendant in the subsequent suit.

. We note that a cumulation of errors and issues ignores the language of Uniform Rule 2-12.4 which calls, first, for an assignment of errors relied upon and, second, for the issues presented for review. These are two distinct elements of an appellant's brief. The reason for the rule requiring the distinction is to aid this court in identifying and addressing the exact complaints *1364 an appellant has with the proceedings sub judice. See Louisiana Intrastate Gas Company v. Martin Intrastate Gas Company, 623 So.2d 664 (La.App. 1st Cir.), writ denied, 629 So.2d 390 (La.1993).

. BUN (blood uria nitrogen) and creatinine readings are test results that reveal the amount of waste materials in the body that the kidneys are not filtering out. Throughout the trial, counsel for plaintiff also questioned the witnesses about "peak and trough” testing, apparently in an attempt to fault the doctors for not having ordered those tests following the use of gentamicin. When questioned about "peak and trough” levels, Dr. Hebert explained that they are a measure of the antibiotic in the blood. The peak level is the antibiotic level that occurs within an hour or so after the drug is given; the trough is a level which is determined right before the next dose. The peak and trough testing gives the doctor an idea of whether or not the infection is being covered by the antibiotic, and thus is important when gentamicin is used to treat an existing infection. Peak and trough testing is not a measure of toxicity levels; BUN and creatinine testing gives the doctor an indication of how toxic the patient is.

. The probative value of Dr. Pancoast’s notation was made questionable by the testimony of a defense expert witness who cautioned that it was merely an "impression"; that nephrotoxicity would have to be proved by a biopsy of the kidney. Furthermore, there is an indication in the witness’s deposition that Dr. Pancoast later altered her "impression.” Although the Terre-bonne General medical records were admitted into evidence, Dr. Pancoast's deposition was not. Therefore, the accuracy of the notation is questionable. Accordingly, plaintiffs’ assertion that Dr. Pancoast’s statement was proof of causation is without merit.

. Dr. Suazo-Vasquez gave an example. He explained that the creatinine level is not always indicative of kidney function; that kidney function can be zero, as in the case of surgical removal of both kidneys, and the creatinine level may be normal, until several days later when it increases to 10 or 15 if dialysis is not done. Even though both kidneys are removed, it takes days for the creatinine level to start to rise.

. Dr. Hebert also identified the surgery and anesthesia as a likely cause. He stated the surgery was an “intervention" that could explain her subsequent, extremely elevated BUN and creati-nine levels.

. We note that the medical records of Thibodaux General reveal that Mrs. Broussard was nauseated and vomiting on the day preceding surgery.

. We note that the defendants herein filed motions to strike the plaintiffs’ brief or to strike the voluminous attachments thereto, which motions we previously denied. Although the outcome of this appeal is favorable to the defendants, we consider it necessary to assure defendants that the attachments were not considered. We agree with the defendants that the attachments were a mere subterfuge to avoid the page limitations of the court rules. The attachments, as well as the statements made in the brief submitted by counsel for plaintiffs in opposition to the motions to strike, have no place in the proceedings before this court.