SIDNEY NORWOOD, JR., GLORY MAE N. BROWN, WILBERT NORWOOD, SR., ROOSEVELT NORWOOD, ROSALIE N. JACKSON, LOUIS NORWOOD, SR., CLOVIS NORWOOD, ELNORA N. BRADFORD, NEALER G. NORWOOD, SIDNEY NORWOOD, SR., CHARLES EDWARD NORWOOD, SR. AND JOHN ELLA N. LEWIS,
v.
DR. JUAN MEDINA, DR. THOMAS TRAHAN, C & M MEDICAL SERVICES, INC., DR. RICHARD RATHBONE AND LANE MEMORIAL HOSPITAL FOUNDATION.
No. 2009 CA 1780.
Court of Appeals of Louisiana, First Circuit.
March 26, 2010.
Not Designated for Publication.
WILLIAM E. LeBLANC, Donaldsonville, LA, Counsel for Plaintiffs/Appellees Sidney Norwood, et al.
CHris J. LeBLANC, Baton Rouge, LA, Counsel for Defendant/1st Appellant, Lane Memorial Hospital.
DAVID C. BOLTON, WILLIAM C. ROWE, Jr., Baton Rouge, LA, Counsel for Defendant/2nd Appellant, Louisiana Patient's Compensation Fund and Louisiana Compensation, Fund Oversight Board.
Before: DOWNING, GAIDRY and McCLENDON, JJ.
DOWNING, J.
This is an appeal of a judgment rendered in accordance with a jury verdict awarding $500,000.00 in damages based on the medical malpractice of a hospital nursing staff. The jury verdict form shows that the jury found that the nursing staff breached its standard of care and that the breach caused their patient, Mrs. Nealer G. Norwood, a lost chance of survival. For the following reasons, we affirm the trial court judgment.

FACTS
Mrs. Norwood was a seventy-two-year-old woman suffering from significant co-morbidities, including congestive heart failure, C.O.P.D., angina, longstanding hypertension, and diabetes. On the morning of July 7, 1999, Mrs. Norwood was at home recovering from a stroke she had suffered less than two weeks earlier when she had an acute non-hemorrhagic right middle cerebral artery stroke. Mrs. Norwood was taken by ambulance to Lane Memorial Hospital (hereinafter, Lane) emergency room (ER), where she was seen by Dr. Thomas Trahan at 8:30 a.m. After Mrs. Norwood arrived at the hospital that morning, various members of her family (hereinafter, the Norwoods)[1] said they continuously asked the nursing staff and Dr. Trahan to call Dr. Juan Medina, her treating physician. They also requested that she be transferred to Baton Rouge General Hospital so she could be treated by a neurologist.
In the ER, Dr. Trahan examined Mrs. Norwood and ordered diagnostic imaging testing (CAT scan). The CAT scan, performed at 9:30 a.m., showed that Mrs. Norwood's stroke had caused severe damage to the brain. She was returned to the ER at 9:55 a.m., where she remained until she was taken to a telemetry room at 2:13 p.m. Upon arriving in the telemetry room, she was assessed by Sheila Barrett, R.N., who recorded her condition as "unchanged" from the time she arrived at the hospital.
The Norwoods requested again that Dr. Medina be notified about Mrs. Norwood's condition. The phone records show that Nurse Barrett did make a call to Dr. Medina's office at about 3:30 p.m. Nurse Barrett testified that she talked to Carolyn McDaniel, Dr. Medina's office nurse/physician's assistant. She stated that she told Nurse McDaniel that Mrs. Norwood was having trouble swallowing and could not take the prescribed medication by mouth. Nurse Barrett testified that she was told by Nurse McDaniel to hold the medications until Dr. Medina could see her the following day.
Conversely, Nurse McDaniel denied receiving the call from Nurse Barrett. Dr. Medina denied getting Nurse Barrett's message, and he did not know Mrs. Norwood had been admitted into Lane. He testified that he also said that had he known she was at Lane, he would have seen her right away, as he lives near the hospital.
There is conflicting testimony as to when Mrs. Norwood's condition worsened, but around 8:45 p.m. a Lane nurse contacted Dr. Richard Rathbone, who was on call for Dr. Medina, about her. Dr. Rathbone came to the hospital and saw Mrs. Norwood at 10:00 p.m. After examining her, he immediately ordered hydration fluids to be administered by I.V. He also ordered Decadron and Mannitol, medications to decrease the size of the edema. The family said that after Dr. Rathbone's treatment, Mrs. Norwood became more communicative and alert. At about 11:30 p.m., Mrs. Norwood was moved to the Intensive Care Unit (ICU).
While making rounds on the morning of July 8, Dr. Medina became aware that Mrs. Norwood had been admitted to Lane. He saw her at 8:34 a.m. and ordered her to be heparinized and given an "IV push" every twelve hours if systolic blood pressure was less than or equal to 100 mm/Hg. He noted that she was unresponsive. Mrs. Norwood died at 5:25 p.m. that afternoon.

PROCEDURAL HISTORY
The Norwoods filed a complaint with the Medical Review Panel against the hospital and its nursing staff, as well as against Drs. Trahan, Rathbone, Medina, and also against C&M Medical Services (C&M). On November 20, 2001, the panel found that Drs. Trahan, Rathbone, nor the Lane employees, breached their applicable standards of care as to Mrs. Norwood. The panel also found that C&M did not breach its standard of care. The panel did conclude, however, that Dr. Medina failed to meet the applicable standard of care by failing to attend to his patient at the time of her initial admission during the day.
On February 25, 2002, the Norwoods filed suit against Dr. Medina, Dr. Trahan, Dr. Rathbone, C&M and Lane Hospital staff, alleging that the only treatment Mrs. Norwood received during her five-hour stay in the ER was the administration of oxygen. The plaintiffs also asserted that Mrs. Norwood was not given proper medications for her elevated blood pressure to decrease cerebral edema, nor was she given fluids for hydration. The petition urges that this lack of medical treatment resulted in a lost chance of her survival.
On January 13, 2003, on a motion for summary judgment, the trial court dismissed the claims against Dr. Rathbone. On November 8, 2004, it denied a motion for summary judgment as to Lane's liability.
The matter was tried before a twelve-person jury on January 5-8, 2009. At the close of the plaintiffs' case, Lane moved for a directed verdict, which the trial court denied. The jury returned a verdict in favor of the Norwoods. On the verdict form, the jury concluded that Dr. Trahan breached the applicable standard of care, but that his breach was not a proximate cause of Mrs. Norwood's lost chance of survival. The jury also determined that Dr. Medina did not breach the applicable standard of care.
The jury found, however, that Lane's nurses breached the standard of medical care in the treatment of Mrs. Norwood and that their breach caused her a lost chance of survival. The jury awarded damages in the amount of $500,000.00; $100,000.00 was against Lane and $400,000.00 was against its insurer, the Louisiana Patient's Compensation Fund (the PCF).[2]
Both Lane and PCF filed motions for judgment notwithstanding the verdict (JNOV), and, in the alternative, motions for new trial; these motions were denied. The defendants appealed, urging, among other assignments of error, that the jury was clearly wrong in finding that Lane's nurses breached the applicable standard of care. They further urge that the jury was clearly wrong in finding that the alleged breach caused Mrs. Norwood to lose a chance of survival.

MEDICAL MALPRACTICE LIABILITY
Medical malpractice has been defined, in pertinent part, by LSA-R.S. 40:1299.41(A)(13)as:
[a]ny unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient. ...
LSA-R.S. 9:2794 sets for the burden of proof imposed upon the plaintiff in establishing his malpractice claim. The plaintiff must prove by a preponderance of the evidence the following, in pertinent part:
(2) That the defendant ... failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or the skill or failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

DISCUSSION

BREACH
Lane and the PCF first argue that the jury was clearly wrong in finding that the Lane nurses breached the standard of care when the Norwoods' own expert testified that there was no breach.
There are situations when expert testimony is not required to prove medical negligence. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992, p. 9 (La. 10/17/94), 643 So.2d 1228, 1233. Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure is an example of obvious negligence which requires no expert testimony to demonstrate the health care providers' fault. Id., at p. 9, 1234. There are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged medical provider's conduct as well as any expert can. Id.
In this case, the jury apparently found that the Lane nurses were not acting as an advocate for their patient, Mrs. Norwood. There is evidence that Mrs. Norwood stayed in the ER for over six hours without her treating physician being notified that she had not been transferred and was still at Lane hospital. When Mrs. Norwood was taken to the telemetry room, there is evidence in the record that she was not given hydration even though she was unable to swallow. There is conflicting evidence about Nurse Barrett's attempt to contact Dr. Medina. We, therefore, cannot say that the jury erred in making the determination, and that the nurses failed to use reasonable care and diligence, their best judgment in the application of their nursing skills. The jury evidently believed that the nurse or nurses did not try hard enough to convey a message to Dr. Medina about Mrs. Norwood's condition. Since the jury determined that Dr. Medina did not breach his standard of care, it evidently believed that he did not get Nurse McDaniel's message. Based on a review of the evidence, the jury was not clearly wrong in concluding that the nurses breached the applicable standard of care. Accordingly, the assignments of error relating to the nurses' standard of care are without merit.

CAUSATION
Lane and the PCF next argue that the jury was clearly wrong in finding that the breach in standard of care by the nurses caused Mrs. Norwood a lost chance of survival. Defendants contend that the nurses could not administer any treatment without a physician's order.
When a breach in the standard of medical care has been proven, to recover damages, the plaintiff must also demonstrate a causal nexus between the defendant's fault and the alleged injury. LSA-R.S. 9:2794; Pfiffher, 94-0963, 94-0992, at p. 10, 643 So.2d at 1234. The defendants contend that even if a breach in the standard of care did occur, there is no evidence Mrs. Norwood lost a chance of survival as a result. They argue that there was no expert testimony to prove that any medical treatment could have improved Mrs. Norwood's chances to survive this stroke.
On the other hand, the Norwoods contend that Mrs. Norwood lost a chance of survival due to the nurses' failure to alert Dr. Medina of Mrs. Norwood's condition or to see that she was given hydration. To bolster this assertion, the plaintiffs claim that Mrs. Norwood's condition improved after Dr. Rathbone supplied hydration. They claim that since Dr. Medina was not contacted, and no other action was taken, the Lane staff did not act as an advocate[3] for Mrs. Norwood, which resulted in a lost chance of survival.
The causal connection between a patient's death and an unreasonable delay in the diagnosis and treatment of a patient in circumstances involving a complex medical condition is simply beyond the province of a lay person to assess. Pfiffner, 94-0924, 94-0963, 94-0992 at p. 10, 643 So.2d at 1234. Here, however, Dr. Louis T. Giron, Jr., an expert in neurology, testified that the failure to timely administer fluids promptly lessened Mrs. Norwood's chance of survival. Dr. Giron said that a bolus of hydration should have been ordered immediately for Mrs. Norwood. He explained that if you have a clot causing the obstruction of blood flow, nerve cells will die, and an infarct will form at that particular point. He testified that proper hydration helps the blood flow to injured area and helps prevent further damage. Dr. Giron further stated that increased blood circulation could limit the spread of the infarct. Dr. Giron said that since this hydration was not given, Mrs. Norwood's chance of survival was lessened.
In contrast, Dr. Steven Zuckerman, a neurologist, testified for the defense. He explained that one of the side effects of Mrs. Norwood's stroke is called "malignant edema" which occurs when the brain dies off causing a tremendous swelling and crowding out other important structures in the brain. Dr. Zuckerman explained that Mrs. Norwood had an extremely devastating neurological event. He confirmed Dr. Girod's estimate that Mrs. Norwood only had about a 20% survival rate and that she would have been severely impaired had she survived. He explained that certain procedures could be instituted to minimize swelling for some stroke victims. This would include having the patient hyperventilate to lower the carbon dioxide level, which would then constrict the blood vessels. He also testified that certain drugs could be administered to temporarily help reduce swelling, but only if immediate surgery is expected, and Mrs. Norwood was not a surgery candidate. Dr. Zuckerman testified that neither of these options would have increased Mrs. Norwood's chance of survival because too much of her brain had been affected by the stroke. When asked if hydration would have increased Mrs. Norwood's chance of survival, Dr. Zuckerman said "no." He further testified that had Mrs. Norwood survived, she would have been in a vegetative state.
Additionally, Mrs. Norwood's treating physician, Dr. Medina, testified that when he finally got the message that Mrs. Norwood had been admitted to Lane, he looked at her chart and understood that "it was a massive stroke." He further said that since there were no neurologists in Zachary, he had previously told Dr. Trahan to transfer Mrs. Norwood to Baton Rouge General Hospital, and he assumed the transfer had taken place. Dr. Medina said that had he known Mrs. Norwood was at Lane, he would have gone within the hour to see her and he would have administered fluids. Dr. Medina said that Mrs. Norwood was in very bad condition when he examined her in the I.C.U.
Dr. Rhodi Adi is a board certified internal medicine and ER physician. He testified as one of the medical review panel members and also as an ER expert witness. Dr. Adi testified that he was not qualified to render a neurological opinion or to render an opinion about Mrs. Norwood's chance of survival in this case. He explained that the panel unanimously agreed that it was Dr. Medina, and not the Lane staff, who failed to meet the applicable standard of care in the treatment of this patient. He said that, in his opinion, Mrs. Norwood should have been given hydration to be made more comfortable.
Later, when asked if Mrs. Norwood would have had a chance of recovery had she been given proper medical attention when she arrived at the ER, Dr. Adi responded "yes." Dr. Adi qualified that response, however, by saying that whether the proper medical attention would have increased her chance of survival was a "very tricky and a difficult question." He speculated that her stroke could have been so severe that nothing would have made any difference. When asked if Mrs. Norwood had that type of stroke, he responded that he would have to defer to a neurologist for that answer because "I am not qualified to say." He continued: "[T]his is human life. There are factors beyond your anticipation and control that will determine survival." Dr. Adi reiterated that he could not say if Mrs. Norwood had a chance of her survival. He explained that if there was a tiny, miniscule chance of survival, that chance would have been better had she been given the fluids. Dr. Adi stated that the simple answer was yes, that if Mrs. Norwood had a chance at all, that chance would have been better with proper hydration. The answer to the question, however, as to whether she had a chance at all, was beyond his expertise. Dr. Adi said he would have to defer to Dr. Zuckerman's opinion, was that when a person presents to a hospital who is not a candidate for surgery or for aggressive measures to dissolve the blood clot, neither hydration nor medication will increase her chance of survival.
Mrs. Norwood's lost chance of survival involves a complex medical condition, which is beyond the province of lay person to assess, and expert testimony is necessary to make this determination. Pfiffner, 94-0924, 94-0963, 94-0992, at p. 10, 643 So.2d at 1234. Here, however, we have Dr. Giron testifying that fluids would have helped the brain, which in turn would have helped prevent other tissues from dying. Dr. Giron testified that the failure to properly hydrate did lose Mrs. Norwood a chance of survival. He explained that fluids take away the toxins, and even if your artery is stuck, the collateral veins would get some blood to that area to keep the stroke from expanding. He said that although Dr. Rathbone did give her some fluids, it was too late to really help.
Under the manifest error standard of review, a court of appeal may not set aside a jury's finding of fact unless it is clearly wrong. Rosell v. Esco 549 So.2d 840, 844 (La. 1989). Thus, where two permissible views of the evidence exist, the jury's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 883 (La. 1993), quoting Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973). Here, the jury apparently found that the nurses should have done more to apprise the doctors of Mrs. Norwood's situation. After reviewing the record, we conclude that the jury did not err in finding that the nurses failed to act as advocates for their patient. We further conclude that the jury did not err in finding that the Norwoods established the requisite element of causation. Accordingly, the assignments of error relating to causation do not have merit.[4]

DECREE
Accordingly, for the above stated reasons, the trial court judgment rendered in conformity with the jury verdict in favor of the plaintiffs/appellees, the Norwoods, is affirmed. The costs associated with this appeal are assessed against the defendants/appellants, Lane Memorial Hospital and the Louisiana Patient's Compensation Fund.
AFFIRMED.
McCLENDON, J., dissents and assigns reasons.
In this case, the plaintiffs argue that Lane's nursing staff breached their standard of care by failing to act as advocates for Mrs. Norwood. While Mrs. Norwood was in the Lane emergency room, her family repeatedly asked the nursing staff to contact Mrs. Norwood's treating physician, Dr. Medina. The evidence presented at trial was conflicting as to whether there were ever any attempts or actual conversations by the nurses with Dr. Medina's office. The jury could reasonably conclude that the nurses at Lane never called Dr. Medina on behalf of Mrs. Norwood. Thus, the jury did have factual grounds to reasonably determine that the nurses breached their standard of care. However, even if a breach is established, a plaintiff must demonstrate by a preponderance of evidence a causal nexus between the fault and the injury alleged. Pfiffner v. Correa, 94-0992, 94-0963, 94-0924, p. 10 (La. 10/17/94), 643 So.2d. 1228, 1234. The causal connection between a patient's death and an unreasonable delay in diagnosis and treatment of a patient in circumstances involving a complex medical condition, however, is simply beyond the province of a lay person. Id. Given the medical complexity of this case, the plaintiffs were required to prove through expert testimony that the breach caused Mrs. Norwood's lost chance of survival.
However, the causal connection between the breach and Mrs. Norwood's lost chance of survival is unsupported by the evidence. The thrust of the plaintiffs' causation argument is that because the nurses failed to notify Dr. Medina of Mrs. Norwood's stroke and admittance into Lane, she lost a chance of survival. In other words, the nurses unreasonably delayed Mrs. Norwood's treatment, resulting in Mrs. Norwood's lost chance of survival.
The plaintiffs' expert, Dr. Giron, testified that due to Mrs. Norwood's prior medical history and the severity of her stroke, she had a small chance of survival. He also testified that even had she survived, she would have been severely impaired. Dr. Giron further stated that, in his opinion, a bolus of hydration should have been ordered immediately upon Mrs. Norwood's admittance into Lane. Additionally, Dr. Giron specifically stated that unless there was a protocol in place at the hospital, the hydration would have to be ordered by a physician. A nurse would not have been able to administer the treatment.
Dr. Zuckerman, the defendant's expert in neurology, concluded that Mrs. Norwood's chance of survival was about 20%, and if she had survived, she would have been severely impaired. He further explained that although certain procedures can be administered to stroke victims that might minimize a stroke's side effects, said procedures would not have impacted Mrs. Norwood's chance of survival, because her brain had been irreparably harmed by the stroke. Furthermore, Dr. Zuckerman opined that hydration would not have increased Mrs. Norwood's chance of survival.
Most importantly, Dr. Medina testified that Mrs. Norwood would not have had a chance of survival even had he been notified earlier. He testified that she had no chance of survival and, if he would have administered fluids, it would not have been a treatment, but a supportive measure. Further, the amount of fluids that would have been ordered by him, had he been called, would not have been in the amount that the plaintiffs' expert said was necessary.
Clearly, the plaintiffs failed to establish the requisite causation between the nurses' breach and Ms. Norwood's lost chance of survival. Therefore, I respectfully dissent.
NOTES
[1] Sidney Norwood, Jr., Glory Mae N. Brown, Wilbert Norwood. Sr., Roosevelt Norwood. Rosalie N. Jackson, Louis Norwood, Sr., Clovis Norwood, Elnora N. Bradford, Sidney Norwood, Sr., Charles Edward Norwood, Sr., and John Ella N. Lewis are the plaintiffs/appellees in this lawsuit.
[2] The definition has been renumbered and is now renumbered and is found in La. R.S. 40: 1299.41(A)(13).
[3] Defendants assign error to the trial court permitting the Norwoods to ask their hired expert on redirect examination whether the nurses were the patient's advocates when that witness was not asked about patient advocacy on either direct or cross examination. We conclude that if this ruling was in error, it was harmless because there is evidence in the record, including the nurses own admissions, that nurses are trained to be advocates for their patients.
[4] In review of this result, the other assignments of error are pretermitted.