NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 CA 1152

RICKY EDELL JAMES

VERSUS

GEOFFREY L. ODOM, M.D.

*Judgment Rendered:* APR 1 7 2024

********

Appealed from the 21st Judicial District Court
In and for the Parish of Tangipahoa
State of Louisiana
Case No. 2009-0003662

The Honorable Jeffrey Johnson, Judge Presiding

********

| | |
|---|---|
| Randy P. Russell<br>Mandeville, Louisiana | Counsel for Plaintiffs/Appellants<br>Ricky Edell James, in his capacity as the court-appointed provisional tutor of Steadmon Jevon'ta Pichon and Cody Austin James; Anthony Duncan, in his capacity as father and court appointed tutor of Jeline Christian De'Wayne Duncan; Larry Anthony James, Issac Sheville James, and Erica Sams |
| Ashley E. Sandage<br>Shaan M. Aucoin<br>Hammond, Louisiana | Counsel for Defendants/Appellees<br>Geoffrey L. Odom, M.D., North Oaks Medical Center |

********

BEFORE: GUIDRY, C.J., CHUTZ, AND LANIER, JJ.

**LANIER, J.**

In this medical malpractice suit, summary judgment was rendered in favor of the defendants-appellees, Geoffrey L. Odom, M.D., and North Oaks Medical Center (North Oaks).[1] The plaintiffs-appellants, Ricky Edell James, in his capacity as the court-appointed provisional tutor of Steadmon Jevon'ta Pichon and Cody Austin James; Anthony Duncan, in his capacity as father and court appointed tutor of Jeline Christian De'Wayne Duncan; Larry Anthony James, Issac Sheville James, and Erica Sams (collectively the Jameses), now appeal the judgment of the Twenty-First Judicial District Court. For the following reasons, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

On February 2, 2006, Jelaine James was rushed to the North Oaks emergency room after being involved in a high-speed vehicle accident. She was placed under Dr. Odom's care. After three hours and ten minutes of hospitalization, Ms. James was discharged and returned home. She died on February 3, 2006, less than 24 hours after being discharged. The Jameses, as Ms. James's surviving heirs,[2] filed claims for damages and request to establish a medical review panel (MRP) on February 2, 2007, naming North Oaks and Dr. Odom as defendants. The Jameses claimed that a laceration to Ms. James's spleen went undiagnosed and untreated, contributing to her death. Furthermore, the Jameses alleged that Ms. James routinely took Coumadin, an anticoagulant, which increased bleeding in the spleen, but that Dr. Odom failed to observe Ms. James long enough to note her increased risk of bleeding.

---

[1] Although the abbreviation "*et al.*" is used in naming the defendants throughout the record, Dr. Odom and North Oaks are the only two named defendants in the suit.

[2] Jelaine James was the mother of Erica Sams, Larry Anthony James, Isaac Sheville James, Steadmon Jevon'ta Pinchon, Cody Austin James, and Jeline Christian De'Wayne Duncan.

On July 28, 2009, the MRP issued an opinion in which it unanimously found that "[t]he evidence does not support the conclusion that the defendant, [North Oaks], failed to comply with the appropriate standard of care." The MRP went on to say that "[t]here is a issue of material fact, not requiring expert opinion, bearing on liability for [Dr. Odom] for consideration by the court." The MRP gave three reasons for this conclusion:

(1) Specifically, because the record indicated [Ms. James] was a restrained driver but had no evidence of seatbelt trauma to her trunk, the Panel would have liked to have had more information on the type of injury sustained by the decedent's mother, who was also a passenger in the accident vehicle, to help determine the level of impact and potential resulting injuries to [Ms. James];

(2) A detailed explanation by Dr. Odom as to what he meant by [Ms. James's] vital signs being "stable"; and

(3) An investigation into whether something happened physically traumatic to [Ms. James] after she was discharged from [North Oaks], including the circumstances of her having ingested a medication (Ultram) that was not prescribed to her on discharge from North Oaks, which medication was noted in the autopsy report. The panel is concerned that the Ultram could have contributed to the patient's demise by virtue of its potential interaction with Coumadin in [Ms. James's] system.

On October 16, 2009, the Jameses filed a petition for wrongful death and survival damages in which they made all the same claims against North Oaks and Dr. Odom as in the request for the MRP. On April 28, 2023, the defendants filed a motion for summary judgment, in which they averred that the Jameses had not identified an expert who could establish a breach of the standard of care by the defendants which would have resulted in Ms. James's damages and death. After a hearing and review of the exhibits submitted, the trial court signed a judgment, which was filed into the record on June 29, 2023, granting summary judgment in favor of North Oaks and Dr. Odom and dismissing the Jameses' claims with prejudice. The Jameses have appealed this judgment.

## ASSIGNMENT OF ERROR

The Jameses assert:

The trial court erred in granting the North Oaks and Odom Motion for Summary Judgment in applying *Samaha v. Rau*,[3] [2007-1726 (La. 2/26/08), 977 So.2d 880] based on the evidence in support of the Motion for Summary Judgment which was insufficient in meeting the mover's burden of showing that [the Jameses] lacked support of any essential element of their case, and based on the evidence in opposition to the Motion for Summary Judgment establishing the existence of genuine issues of material fact as to the North Oaks and Odom ... liability.

## STANDARD OF REVIEW

In determining whether summary judgment is appropriate, appellate courts review evidence *de novo* under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. *Methvien v. Our Lady of the Lake Hospital*, 2022-0398 (La. App. 1 Cir. 11/4/22), 354 So.3d 720, 723. In motions for summary judgment in the context of medical malpractice, the burden of proof does not require that the medical care provider disprove medical malpractice but only that the medical care provider raise as the basis of its motion that the plaintiff cannot support his burden of proof at trial to demonstrate medical malpractice. *Methvien*, 354 So.3d at 723-24; See also *Samaha*, 977 So.2d at 887-88.

Once the medical care provider has made a prima facie showing that the motion should be granted, then the burden shifts to the plaintiffs to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. See La. C.C.P. art. 966(D)(1); see also *Samaha*, 977 So.2d at 887-88. It is well established that to meet the burden of proof in a medical malpractice action, the plaintiff generally is

---

[3] The trial court made no reference in its judgment or in its oral reasons for judgment to the *Samaha* case. We also note that La. C.C. art. 966, which governs procedure for a motion for summary judgment, has been amended since *Samaha* was decided.

4

required to produce expert medical testimony as a matter of law. *Methvien*, 354 So.3d at 724; *Fagan v. LeBlanc*, 2004-2743 (La. App. 1 Cir. 2/10/06), 928 So.2d 571, 575. The jurisprudence has held that this requirement of producing expert medical testimony is especially apt when the defendant has filed a motion for summary judgment and supported such motion with expert opinion evidence that the treatment met the applicable standard of care. *Methvien*, 354 So.3d at 724; *Boudreaux v. Mid-Continent Casualty*, 2005-2453 (La. App. 1 Cir. 11/3/06), 950 So.2d 839, 844, writ denied, 2006-2775 (La. 1/26/07), 948 So.2d 171. The opinion of the medical review panel is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit. *Methvien*, 354 So.3d at 724.

## DISCUSSION

To establish a claim for medical malpractice, the plaintiffs must prove the following by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. See La. R.S. 9:2794; *White v. LAMMICO*, 2021-1222 (La. App. 1 Cir. 4/8/22), 342 So.3d 63, 67. In the context of medical malpractice, the burden of proof for a motion for summary judgment does not require that the medical care provider disprove medical malpractice, but only that the medical care provider point to the absence of factual support for one or more elements essential to the plaintiff's claim. La. C.C.P. art. 966(D)(1); *White*, 342 So.3d at 67.

It is well established that to meet the burden of proof in a medical malpractice action, the plaintiff is generally required to produce expert medical testimony as a matter of law. *White*, 342 So.3d at 67; *Fagan*, 928 So.2d at 575. The jurisprudence recognizes an exception to the requirement of expert testimony

where the claim arises out of an obviously careless act from which a lay person can infer negligence. *White*, 342 So.3d at 67-68; *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So.2d 1228, 1233-34. In the instant case, the Jameses allege that Dr. Odom failed to diagnose Ms. James's injury to her spleen and discharged her while she still had an untreated injury that proved to be fatal. The alleged negligence is not something that would constitute obvious carelessness by Dr. Odom that could have caused Ms. James's death less that 24 hours after she was discharged; thus, expert medical testimony is necessary in this instance. See *White*, 342 So.3d at 68.

In support of their motion for summary judgment, Dr. Odom and North Oaks filed into evidence the Jameses' claims for damages and request to establish an MRP, the opinion of the MRP, the Jameses' petition for wrongful death and survival damages, and an email from defense counsel to plaintiffs' counsel dated February 23, 2023. The opinion of the MRP does state that there were "material issues of fact, not requiring expert opinion," as explained above. For those reasons, the MRP could not reach a decision as to whether Dr. Odom failed to comply with the appropriate standard of care. Two of the three issues would ostensibly require testimony from Dr. Odom, which is not included in the record.[4]

The February 23, 2023 email contains a request for admissions and a second set of interrogatories propounded to the Jameses. The single request for admission reads, "Admit or deny that no expert has opined that a breach occurred in this case." Dr. Odom and North Oaks submitted that the Jameses have not answered this request for admission, and no response from the Jameses is included in the exhibit. We also note that at the time the trial court rendered its summary judgment, the case was seventeen years old. When the trial court asked the parties

---

[4] The third issue, whether Ms. James's mother was injured in the accident, was subsequently answered. Ms. James's mother was not in the vehicle at the time of the accident.

6

why the case has taken so long to resolve, counsel for the Jameses could only answer, "The case has just dragged on."

In opposition to the motion for summary judgment, the Jameses filed into evidence Acadian Ambulance records from February 2, 2006, North Oaks emergency room records from February 2, 2006, St. Tammany Parish Hospital records from February 3, 2006, the autopsy protocol dated February 6, 2006, Ms. James's death certificate, the deposition of Michael B. Defatta, M.D., the deposition of Harvey L. Malone, M.D., the deposition of John S. Phillips, M.D., and the Jameses' responses to interrogatories. Dr. Defatta performed the autopsy on Ms. James, and Drs. Malone and Phillips sat on the MRP for the instant case.

Interrogatory number eleven of those propounded by Dr. Odom and North Oaks to the Jameses is written as follows:

> Identify each expert witness you have relied upon in any way in support of your claims in the Petition or any expert witnesses you may or will call at any hearing or possible [trial] of this matter as to any issue in this case, and with respect to each such witness, please state the following:
>
> Name and address;
> Specialty or field of expertise of each such expert;
> The subject matter on which the expert is expected to testify;
> A summary of the grounds or facts on which the expert is expected to rely for each of his opinion; and
> Whether such witness has provided a statement to plaintiff and if so, please describe and produce said statement.

The Jameses' response to the interrogatory was, "See Plaintiffs' Responses to Interrogatories Nos. 6 and 11, above ... to the trial of this matter."

Interrogatory number six of Dr. Odom's and North Oaks's interrogatories reads as follows:

> List the name and address of each person on whose testimony, statements or information you base the allegations of your Petition.

The Jameses' response listed 22 individuals or persons and included names of some witnesses with their addresses. Two of the individuals listed are Drs. Malone

7

and Phillips, but they are not specifically identified as experts. In the seventeen-year duration of the instant case, the Jameses had not specifically identified any of their potential witnesses, including Drs. Malone and Phillips, as experts; rather, the Jameses provided to Dr. Odom and North Oaks a non-exhaustive list of witnesses that were not distinguished as either lay or expert witnesses, some of which are the plaintiffs themselves.

The Jameses have not given a field of expertise of any witness, nor the factual matter on which they would base their expert opinions. There is no affidavit filed by the Jameses in the record that would identify who they would call as an expert witness, and the record has not been supplemented with any expert medical report. See Mariakis v. North Oaks Health System, 2018-0165 (La. App. 1 Cir. 9/21/18), 258 So.3d 88, 94.

However, Dr. Odom and North Oaks filed a motion to extend the discovery deadline on March 30, 2023. The trial court granted the motion and extended the discovery deadline to October 1, 2023. Dr. Odom and North Oaks filed the motion for summary judgment on April 28, 2023, and summary judgment was signed on July 6, 2023, 87 days prior to the discovery deadline. Although the instant case was approximately seventeen years old at the time, the discovery deadline had not yet been reached when the summary judgment was signed. The Jameses therefore still had time to identify expert witnesses. Where a motion for summary judgment is based on a plaintiff's lack of expert testimony necessary to meet his burden of proof at trial, a substantial injustice occurs when the plaintiff is not permitted to oppose the motion with an expert witness where, as here, the record demonstrates the discovery deadline had not been reached. See Mariakis, 258 So.3d 95.

Based on the foregoing, we note that discovery was still ongoing in the instant case, and the Jameses had until October 1, 2023, to identify expert witnesses. For that reason alone, this court could vacate the summary judgment in

8

favor of the defendants North Oaks and Dr. Odom, and remand this matter to the trial court for further proceedings consistent with this opinion. See Mariakis, 258 So.3d at 97. However, we further note that the evidence introduced by the Jameses in opposition to the motion for summary judgment presents a genuine issue of material fact.

Ms. James's death certificate listed her cause of death as "Blunt Force Traumatic Injuries" as a result of a "Motor Vehicle Accident." In his deposition, Dr. Defatta expanded on the cause of death as being a splenic laceration. He further stated that the toxicology report showed Ms. James tested positive for Tramadol, which is another name for Ultram. He was aware from North Oaks's medical records that she was taking Coumadin, and expected it to show in her toxicology report, but it did not. Instead, Ultram was found to be in her bloodstream at the time of her death, and Dr. Defatta could not find in the medical records where Ultram was administered to Ms. James.

Dr. Defatta stated that after researching the effects of Ultram, he found that it was contraindicated, meaning that Coumadin and Ultram taken together would increase the risk of bleeding from the splenic injury. However, Dr. Defatta could not tell from the toxicology report the dosage of the Ultram or the time at which it was taken. He therefore could not state the degree to which, if any, Ultram contributed to Ms. James's bleeding.

Dr. Malone discussed in his deposition what the MRP could and could not understand from the hospital and medical records about Dr. Odom's treatment of Ms. James. Specifically, he assumed Dr. Odom would have known the history of Ms. James's accident, as well as her medical history, based on the medical records that would have been available to Dr. Odom. Dr. Malone gleaned from the medical records that Ms. James's hematocrit level was below normal, which could have indicated that she was either anemic or bleeding at the time Dr. Odom treated

her, but Dr. Malone could not state definitively what her low hematocrit level indicated. Regardless, Dr. Malone said the low hematocrit level was cause for concern.

Dr. Malone observed from the hospital records that Dr. Odom noted that Ms. James's vital signs were stable, which led to one of the MRP's questions of fact. Although Dr. Malone could not offer an opinion as to whether Ms. James's vital signs were in fact stable, he did confirm that they were abnormal. The MRP wanted to hear from Dr. Odom himself why he thought Ms. James's vital signs were stable, although the vitals indicated she was tachycardiac upon her discharge. Dr. Malone stated that the applicable standard of care required Dr. Odom to investigate further, or admit Ms. James to the hospital for a team of specialized doctors to address the issue.

Dr. Malone further stated that the applicable standard of care would have required Dr. Odom to refer Ms. James to a team of physicians to adequately assess Ms. James's condition. Dr. Malone also stated that more likely than not, Ms. James would not have died when she did had she been kept at the hospital longer for further observation of her tachycardia. More succinctly, Dr. Malone stated that the applicable standard of care required Dr. Odom to determine the cause of Ms. James's tachycardia, and failing to do so was tantamount to a breach of the applicable standard of care. When asked if Dr. Odom's assessment of Ms. James's vitals as stable had bearing on whether he breached the applicable standard of care, Dr. Malone stated:

> Does it change what I think he should have done ... yes and no. If her heart rate stayed tachycardiac, then it has to be addressed. If for some reason he saw stable vital signs, and I don't know where he saw that, then I can understand his thinking.
> [T]hat is why I left that up to the courts to decide. I don't know what he meant by that. But, yes, sir, if that was me, I would like to believe I would address that.

10

In Dr. Phillips's deposition, he concurred with Dr. Malone in stating that Dr. Odom's note that Ms. James's vital signs were stable was vague, given her abnormal tachycardiac symptoms, and required further explanation. He also stated that her taking Coumadin put her at risk for bleeding. Dr. Philipps testified that it would have been part of the applicable standard of care that Dr. Odom be aware of both Ms. James's vehicle accident history and her Coumadin therapy. Dr. Phillips noted that the medical records document that Ms. James was anxious throughout her emergency treatment, and her anxiety could have been the cause of her tachycardia, but the records do not indicate that her anxiety was ever alleviated. However, because Ms. James's pain was being relieved, Dr. Phillips stated it was important to consider other possible causes of tachycardia, such as anemia or a hemorrhage.

Dr. Phillips also stated that the records indicate that no diagnostic testing or radiography was done on Ms. James's abdomen to locate possible internal injuries. He noted from the records that Ms. James did not receive a sufficient amount of saline to bring her pulse down. The records indicate, however, that no tenderness was found in her chest area, although the autopsy report indicated that Ms. James had a splenic rupture. In Dr. Phillips's opinion, Ms. James's would have been in notable pain from a splenic injury while she was in the emergency room. Therefore, Dr. Phillips opined that anxiety or trauma would have been the only two explanations for Ms. James's tachycardia.

Dr. Phillips also concurred with Dr. Malone by stating that Ms. James should have remained in the hospital for further observation to determine the cause of her tachycardia. When asked if Dr. Odom breached the applicable standard of care, Dr. Phillips answered, "I'm going to say yes." While he further stated that it is not a deviation from the applicable standard of care to discharge a patient with an elevated heart rate, Dr. Phillips said that the symptom "has to be addressed."

11

Dr. Phillips also stated that there was no documentation that anxiety was ruled out as the cause of the tachycardia, and that if Ms. James had been prescribed Ultram at the hospital, it could have worsened her bleeding. However, he could not tell if Ultram was prescribed by personnel at North Oaks. Dr. Phillips concurred with Dr. Defatta that Ultram is contraindicated with Coumadin.

Based on our review of the record, we find that there is a genuine issue of material fact whether North Oaks and/or Dr. Odom breached the applicable standard of care by discharging Ms. James without fully addressing her tachycardiac symptoms. We further find there is a genuine issue of material fact whether Ultram was prescribed to Ms. James by North Oaks personnel, and whether it contributed to Ms. James's death. We therefore find that the trial court erred in granting summary judgment in favor of North Oaks and Dr. Odom.

## DECREE

The judgment of the Twenty-First Judicial District Court in favor of the appellees, North Oaks Medical Center and Geoffrey L. Odom, M.D., is reversed and this matter is remanded for further proceedings consistent with this opinion. All costs of this appeal are assessed to the appellees.

**REVERSED; REMANDED.**

12